**Shirley C. SHEHADEH, Appellant,**

v.

**CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF MARYLAND, et al.**

**No. 76–1790.**

United States Court of Appeals, District of Columbia Circuit.

Submitted without Oral Argument Oct. 19, 1977.

Decided Nov. 8, 1978.

Patricia M. Worthy, Washington, D. C., was on brief, for appellant.

Bernard M. Dworski, Washington, D. C., was on brief, Douglass J. McCollum, Washington, D. C., for appellees.

Before FAHY, Senior Circuit Judge, and TAMM and ROBINSON, Circuit Judges.

Opinion for the Court filed by ROBINSON, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal exacts a review of the District Court's summary dismissal of an employment-discrimination action.[1] Appellant had alleged that, because of her sex and her husband's Arabic descent, she was discharged in 1968, was refused rehiring thereafter, and was effectively barred from other jobs by the former employer's persistent release to prospective employers of false and derogatory references, all assertedly in violation of Title VII of the Civil Rights Act of 1964.[2] The District Court reasoned that the gravamen of the suit was the 1968 discharge and, rejecting appellant's legal theory of continuing discrimination, concluded that the firing was immune from attack because, in its view, appellant had failed to pursue available administrative remedies in timely fashion.[3] The court also denied appellant leave to augment her complaint by averment of another discriminato-

---

1. *Shehadeh v. Chesapeake & Potomac Tel. Co.,* No. 75–1636 (D.D.C. May 21, 1976) (unreported), Appellant's Appendix (App.) 1.

2. Pub.L. No. 88–352, tit. VII, § 701 *et seq.,* 78 Stat. 253 (1964), as amended, 42 U.S.C. § 2000e *et seq.* (1976).

3. *Shehadeh v. Chesapeake & Potomac Tel. Co., supra* note 1, at 3–8, App. 4–9.

ry refusal by appellees—in 1975—to employ her.[4]

We affirm the District Court's ruling on appellant's proposed supplementation since, even with full proof of all facts charged, it would not have disclosed conduct entitling her to relief.[5] We find, however, that quite apart from the 1968 discharge, appellant sufficiently alleged a continuing practice of adverse referencing violative of Title VII,[6] and that she timely and satisfactorily exhausted administrative remedies with respect thereto.[7] Accordingly, we reverse the District Court's judgment of dismissal and remand the case for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1955, appellant Shehadeh was hired by Chesapeake & Potomac Telephone Company of Maryland (C&P of Maryland), one of the appellees here. In 1968, while pregnant, she was released. Her efforts on several occasions thereafter to gain reemployment with the company were unavailing.[8] In September, 1971, she applied for a position with Capital Credit Corporation, but that did not materialize.

On January 22, 1973, appellant lodged two charges of employment discrimination with the Equal Employment Opportunity Commission. One alleged that C&P of Maryland had dismissed her because of her pregnancy, and had discriminatorily refused to rehire her and had provided adverse references to numerous prospective employers—including Capital Credit Corporation—because of her sex. Appellant protested concurrently in her second charge that Capital Credit had denied her employment for invidious reasons.

In February, 1973, appellant was rebuffed in her effort to secure a job with American Automobile Association. On March 10 ensuing, she filed a third charge—against the Association for discriminatory refusal to hire—in which she implicated C&P of Maryland as the instigator.[9] On April 27, 1973, appellant complained to the Commission of similar disparate treatment by Reuben H. Donnelley Corporation in regard to her unfruitful application two weeks earlier for employment with that firm. Again she attributed her lack of success to unlawful interference by C&P of Maryland.

In May, 1974, the Commission notified appellant that it lacked jurisdiction over the filing of January 22, 1973—her first—because the charge was not initiated within 210 days of the discriminatory act alleged, as required by Title VII.[10] As a matter of course, the Commission, in July and October of 1975, issued to appellant notices of a

---

4. *Id.* at 8–11, App. 9–12.

5. Discussed in Part III *infra*.

6. Discussed in Parts II(A), (B) *infra*.

7. Discussed in Parts II(C), (D) *infra*.

8. She unsuccessfully sought reemployment on four occasions during the three years following her discharge.

9. This charge was amended in September, 1974, formally to name C&P of Maryland as a respondent. See First Amended Complaint ¶ 44, App. 23; EEOC Charge No. TBA3–1115, App. 38. The precise date of the alleged discriminatory incident is unclear. For present purposes, we adopt February, 1973, without foreclosing the District Court from taking a divergent view on remand. See text *infra* at notes 77–80.

10. At the time of the events described in this filing—the latest being communication of an adverse reference to Capital Credit Corporation in 1971—Title VII directed that a charge of employment discrimination in a deferral state be submitted to the Commission within 210 days of the act challenged as discriminatory. Title VII, § 706(d), 42 U.S.C. § 2000e–5(e) (1970). The filing period was extended to 300 days by amendment in 1972. Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, § 4(a), 86 Stat. 104, codified at Title VII, § 706(e), 42 U.S.C. § 2000e–5(e) (1976), quoted in note 20 *infra*. Because the difference in the pre-amended and amended time limitations was not material to the District Court's view of the case, it found no occasion to determine which ought to apply, see *Shehadeh v. Chesapeake & Potomac Tel. Co., supra* note 1, at 4 n.2, App. 5 n.2, and the discrepancy has remained irrelevant on this appeal.

right to sue [11] on all grievances asserted theretofore.

On September 17, 1975, appellant filed an employment application with both C&P of Maryland and Chesapeake & Potomac Telephone Company of the District of Columbia (C&P of D.C.). On December 18 following, while the application was still pending, appellant proffered her fifth charge to the Commission. Therein she averred that the two companies had discriminatorily discharged her in 1968, had wrongfully refused to reemploy her subsequently, and by means of adverse references had discouraged prospective employers from engaging her. She indicated additionally that she had tendered a job application to them during the previous September.

On October 3, 1975, appellant instituted a Title VII action in the District Court against Capital Credit Corporation, American Automobile Association, Reuben H. Donnelley Corporation and C&P of D.C. In November, 1975, the court permitted appellant to file an amended complaint incorporating the original complaint, adding C&P of Maryland as a defendant, and appending state-law claims of slander and tortious interference with contract rights. In February, 1976, appellant received notice of her right to sue on the fifth and last charge submitted to the Commission. At the end of that month she moved in the District Court for leave to file a second amended complaint.[12] Therein she incorporated the allegations of the first amended complaint and recounted the substance of the December, 1975, charge.

By stipulation, all claims against Capital Credit Corporation, American Automobile Association and Reuben H. Donnelley Corporation were dismissed with prejudice.[13]

The Title VII counts contained in appellant's first amended complaint were similarly abandoned as to C&P of D.C.[14] Thus C&P of Maryland was left as sole defendant to the Title VII counts of the first amended complaint. Both telephone companies, however, remained defendants to the state-law counts of that complaint, as well as potential defendants to the still unfiled second amended complaint.

Subsequently, on May 21, 1976, the District Court granted appellees' motion to dismiss the first amended complaint in its entirety. The court held that it lacked subject-matter jurisdiction over the Title VII counts because appellant had failed to present an administrative complaint within the time prescribed by Title VII.[15] Though appellant maintained that, in light of her allegations of continuing discriminatory conduct, her charges were seasonably filed with the Commission, the court deemed only the effects of the original discharge continuing.[16] Viewing appellant's proposed second amended complaint as one in essence addressed to the 1968 termination both in allegations and requested remedies, the court declined to indulge its filing,[17] and the pendent state-law claims were then dismissed because no federal causes remained to be tried.[18] Appellant now urges on appeal that the District Court should have entertained the claims advanced in the first amended complaint, or at least those that she endeavored to assert in the second.

## II. TIMELINESS AND EFFICACY OF THE ADMINISTRATIVE CHARGES

Prior to institution of suit, an individual asserting a violation of Title VII must register his grievance with the Equal

---

**11.** See text *infra* at notes 21–22.

**12.** So denominated by appellant, but more accurately a supplemental complaint. Fed.R. Civ.P. 15(d).

**13.** *Shehadeh v. Chesapeake & Potomac Tel. Co., supra* note 1, at 3, App. 4.

**14.** *Id.*

**15.** *Id.* at 3–5, App. 4–6. See Title VII, § 706(e), 42 U.S.C. § 2000e–5(e) (1976), quoted *infra* note 20. See note 10 *supra*.

**16.** *Shehadeh v. Chesapeake & Potomac Tel. Co., supra* note 1, at 6, App. 7.

**17.** *Id.* at 10–11, App. 11–12.

**18.** *Id.* at 11, App. 12.

Employment Opportunity Commission.[19] When deferral to a state agency is warranted, the charge must be lodged with the Commission within 300 days "after the alleged unlawful practice occurred."[20] In the event of dismissal by the Commission, or its failure to institute its own suit or to arrange a conciliation accord within 180 days after submission of the charge, a "right-to-sue" notice is issued to the complaining party.[21] Thereupon, and within 90 days, the complainant may commence a civil action against the respondent named in the charge.[22]

■ A complainant who is tardy either in filing his discrimination charge with the Commission or in subsequently instituting his suit in court ordinarily will be denied a

**19.** See Title VII, § 706(e), 42 U.S.C. § 2000e–5(e) (1976); *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147, 157 (1974); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668, 675–676 (1973). Of course, when a plaintiff-class action is brought, all members of the class need not bring charges before the Commission, *Laffey v. Northwest Airlines, Inc.,* 185 U.S.App.D.C. 322, 365, 567 F.2d 429, 472 (1976), cert. denied, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978); *Bowe v. Colgate-Palmolive Co.,* 416 F.2d 711, 720 (7th Cir. 1969), so long as they could have filed their grievances individually when the class filing was effected. *Laffey v. Northwest Airlines, Inc., supra,* 185 U.S.App.D.C. at 365, 567 F.2d at 472; *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 246 (3d Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

**20.** Title VII, § 706(e), 42 U.S.C. § 2000e–5(e) (1976), providing:

A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

In states affording administrative remedies for conduct forbidden by Title VII, exhaustion of these remedies is a prerequisite to initiation of a Title VII suit in court. See Title VII, § 706(c), 42 U.S.C. § 2000e–5(c) (1976); *Love v. Pullman Co.,* 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972). See also *EEOC v. Wah Chang Albany Corp.,* 499 F.2d 187, 190 (9th Cir. 1974). But a complainant need not resort to the state agency in regard to every incident comprising a continuous series of discriminatory acts, *Weise v. Syracuse Univ.,* 522 F.2d 397, 412 (2d Cir. 1975); *Oubichon v. North Am. Rockwell Corp.,* 482 F.2d 569, 571 (9th Cir. 1973), and filing with the wrong state agency may in appropriate circumstances be excused. *Taylor v. Vocational Rehabilitation Center,* 10 F.E.P. Cas. 936 (W.D.Pa.1975). When a charge is presented to the Equal Employment Opportunity Commission, oral notification to the state agency by the Commission on behalf of the complainant will suffice. See *Love v. Pullman Co., supra.* Thus the Commission has undertaken generally to provide such notice when it is apprised of colorable violations of state law, and that procedure has been in effect at all times relevant to the litigation before us. See 29 C.F.R. § 1601.-12 (1977).

In her first charge, appellant indicated that she had contacted local authorities, but whether she resorted to the agency possessing suitable jurisdiction is unclear. The record contains evidence of deferrals by the Commission to the District of Columbia Office of Human Rights and the Maryland Human Rights Commission in some but not all instances. On remand, the District Court should ascertain whether appellant or the Equal Employment Opportunity Commission has sufficiently undertaken deferral of appellant's claims and, if either has not, whether the deficiency has been or can be cured. See *Mitchell v. Mid-Continental Spring Co.,* 466 F.2d 24, 25–27 (6th Cir. 1972), cert. denied, 410 U.S. 928, 93 S.Ct. 1363, 35 L.Ed.2d 589 (1973).

**21.** Title VII, § 706(f)(1), 42 U.S.C. § 2000e–5(f)(1) (1976).

**22.** *Id.* Receipt of the notice triggers the suit-filing period. *Plunkett v. Roadway Express, Inc.,* 504 F.2d 417 (10th Cir. 1974). See *McDonnell Douglas Corp. v. Green, supra* note 19, 411 U.S. at 798, 93 S.Ct. at 1822, 36 L.Ed.2d at 675–676; *Russell v. American Tobacco Co.,* 528 F.2d 357, 365 (4th Cir. 1975), cert. denied, 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976).

judicial audience.[23] In the instant case, all agree that appellant seasonably initiated litigation in the District Court. At issue is whether the forerunning tender of her accusations to the Commission, upon which her cause of action is predicated, came fatally late.

### A. *The Discriminatory Activities Charged*

Appellant's first amended complaint in the District Court was predicated upon four administratively-presented charges. The earliest, submitted on January 22, 1973, protested discrimination by C&P of Maryland with respect to "conditions of separation" and rehiring,[24] and by Capital Credit Corporation in its denial of the opportunity to work for it. It further averred that C&P of Maryland

> continues to discriminate against me in obtaining other employment because of [a former supervisor's] intent (through the C & P Employment Ofc) to prohibit me from doing so and has been successful on enumerous [*sic*] occasions since my termination . . . up until now. Capital Credit is one of the offices who was greatly influenced by [the supervisor]. They had already hired me, but later failed to allow me to report to work after talking to [the supervisor].[25]

Appellant's third administrative charge, lodged on March 10, 1973, described discriminatory interference by C&P of Maryland with appellant's efforts to obtain employment with American Automobile Association.[26] Her fourth administrative charge, nominally against Reuben H. Donnelley Corporation, was filed on April 27, 1973. It proclaimed that, as a result of unlawful activity by appellee, the Donnelley Corporation had refused to hire appellant a fortnight earlier.

■ Because appellant stipulated to the District Court's dismissal of all alleged wrongdoers except the two telephone companies,[27] and because she abandoned further effort to implicate C&P of D.C. in the Title VII counts of her first amended complaint,[28] the issue on timeliness necessarily narrows to C&P of Maryland. Its 1968 discharge of appellant, first attacked administratively in 1973, had by then become legally stale and thus unchallengeable.[29] So also, albeit by a much smaller margin, had its refusals to rehire appellant, the most recent of which had occurred in 1971.[30] The inquiry does not end at this point, however, for the claim common to each of the first four administrative charges[31] was derogatory references by C&P of Maryland to appellant's prospective employers.

Appellant's allegations in the latter regard were, however, summarily set for naught by the District Court. The court explained:

> The references were requested by businesses to which plaintiff applied, not dis-

---

**23.** ·See *United Airlines, Inc. v. Evans,* 431 U.S. 553, 554–559, 97 S.Ct. 1885, 1887–1889, 52 L.Ed.2d 571, 576–579 (1977) (charge-filing); *Macklin v. Spector Freight Sys., Inc.,* 156 U.S. App.D.C. 69, 76, 478 F.2d 979, 986 (1973) (charge-filing); *Reeb v. Economic Opportunity Atlanta, Inc.,* 516 F.2d 924, 925 (5th Cir. 1975) (charge-filing); *Stebbins v. Nationwide Mut. Ins. Co.,* 469 F.2d 268, 269 (4th Cir. 1972), *cert. denied,* 410 U.S. 939, 93 S.Ct. 1403, 35 L.Ed.2d 606 (1973) (suit-filing); *Wong v. The Bon Marche,* 508 F.2d 1249–1251 (9th Cir. 1975) (suit-filing). We recently held that the time restriction on filing charges with the Commission is not jurisdictional, but subject to extension in deserving cases. *Laffey v. Northwest Airlines, Inc., supra* note 19, 185 U.S.App.D.C. at 367–368, 567 F.2d at 474–475. The instant case does not present an occasion for invocation of equitable exceptions.

**24.** EEOC Charge No. TBA3–1030, App. 42.

**25.** *Id.*

**26.** The date on which employment was denied is unsettled. See text *infra* at notes 77–80.

**27.** See text *supra* at note 13.

**28.** See text *supra* at note 14.

**29.** See note 20 *supra; United Air Lines v. Evans, supra* note 23.

**30.** We speak here to the alleged denials of reemployment by C&P of Maryland that appellant's first amended complaint brought under assault. We thus exclude from present discussion the 1975 employment application central to appellant's second amended complaint, which we consider in Part III *infra*.

**31.** See note 28 *supra*.

tributed *sua sponte* by defendants, and the fact that they were not favorable to plaintiff is a natural outgrowth of the original termination. Thus, the references are . . . an effect of the [discharge].[32]

The District Court did not find that appellant had not seasonally alerted the Commission to the asserted dissemination of derogatory references by C&P of Maryland. It ruled instead that her challenge to that practice constituted a belated attack on the 1968 termination. Dismissal of her lawsuit, then, was essentially for a perceived failure to state a claim for which relief might be granted.[33] We think the District Court misconceived the substantiality of appellant's allegations.[34] We think, too, that she timely asserted those claims.[35]

**B.** *The Alleged Discriminatory Referencing*

■ At least one thesis evident in appellant's administrative charges and judicial

complaint belies the District Court's conclusion that the negative tenor of the employment references was a "natural outgrowth" of the original termination.[36] No more than that need be shown to establish that dismissal of the suit was premature.[37] For it is well settled that a complaint may be rejected for failure to state a remediable claim only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." [38]

■ Appellant alleged that pejorative references were distributed deliberately and for invidious reasons.[39] Her charges reflect a conviction that certain critically-situated personnel at C&P of Maryland harbor an on-going discriminatory animus toward her. And the record, though sparse at this juncture,[40] evinces her attempt to establish that such personnel communicated with prospective employers.[41] If, as appellant avers, *untrue* and damaging accounts of her em-

---

32. *Shehadeh v. Chesapeake & Potomac Tel. Co., supra* note 1, at 7–8, App. 8–9.

33. See Fed.R.Civ.P. 12(b)(6). Compare *United Air Lines, Inc. v. Evans, supra* note 23, 431 U.S. at 556 n.8, 97 S.Ct. at 1888 n.8, 52 L.Ed.2d at 577 n.8; *id.* at 561 n.1, 97 S.Ct. at 1890 n.1, 52 L.Ed.2d at 580 n.1 (Marshall & Brennan, JJ., dissenting); *Egelston v. State Univ. College at Geneseo,* 535 F.2d 752, 754 (2d Cir. 1976).

34. See Part II(B) *infra.*

35. See Part II(C)–(D) *infra.*

36. See text *supra* at note 32.

37. We assume for now, and develop later in Parts II(C)–(D), that appellant seasonably complained of C&P of Maryland's discriminatory dissemination of references.

38. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90, 96 (1974), quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957); accord, *Egelston v. State Univ. College at Geneseo, supra* note 33, 535 F.2d at 754.

39. See First Amended Complaint ¶¶ 32, 47, App. 21, 23–24. See also *id.* ¶¶ 25, 38, 40, 41, 49, App. 20, 22, 24; EEOC Charge No. TBA3–1030, App. 42.

40. The District Court denied appellant discovery on the merits. See note 41 *infra.*

41. The District Court purported to predicate its ruling on the "entire record," though declining to reach appellees' motion for summary judgment. *Shehadeh v. Chesapeake & Potomac Tel. Co., supra* note 1, 1–4, App. 1–5. Thus the court may have felt, on its view of the record as then compiled, that certain of appellant's factual arguments lacked substance. But a foray into the record pursuant to a motion to dismiss under Rule 12(b)(6), see note 33 *supra* and accompanying text, converts the motion into one for summary judgment, with an attendant obligation to allow the parties reasonable discovery on the merits. See, *e. g., Georgia S. & F. Ry. v. Atlantic Coast Line R.R.,* 373 F.2d 493, 496–498 (5th Cir.), *cert. denied,* 389 U.S. 851, 88 S.Ct. 69, 19 L.Ed.2d 839 (1967); *Costen v. Pauline's Sportswear, Inc.,* 391 F.2d 81, 84–85 (9th Cir. 1968); Fed.R.Civ.P. 12(b)(6) ("[i]f . . . matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56"); 2A J. Moore, Federal Practice ¶ 12.09[3], at 2302 (2d ed. 1948) and authorities cited therein. The District Court had earlier stayed appellant's motion for discovery related to the merits on the theory that the ruling on the pending motion to dismiss might dispose of the case. *Shehadeh v. Chesapeake & Potomac Tel. Co., supra* note 1, (D.D.C. May 11, 1976) (order).

ployment qualifications were purposefully circulated in consequence of her gender or her husband's ancestry, they were new and independent acts of discrimination, and the "natural outgrowth" of her dismissal would have been appreciably surpassed.[42] Though the discharge and the disparaging references assertedly may have been prompted by the same discriminatory state of mind,

that would not reduce the references to mere effects of the firing.[43]

■ Whether dissemination of adverse references for reasons condemned by Title VII constitutes an unlawful "employment practice" within its contemplation presents, however, a more substantial question.[44] Section 703(a)(1) provides in pertinent part:

**42.** See note 43 *infra.*

**43.** *Cf. United Air Lines, Inc. v. Evans, supra* note 23. There the Supreme Court found that the plaintiff alleged no current violation of Title VII in the operation of the defendant airline's seniority system. Although the system plainly perpetuated the *effects* of a prior discriminatory discharge through its impact on pay and fringe benefits, the plaintiff did not claim that the system treated former employees who were discharged for a discriminatory reason any differently from prior employees who resigned or were terminated for a non-discriminatory reason. 431 U.S. at 557–559, 97 S.Ct. at 1888, 52 L.Ed.2d at 577–579. When, however, false reports of a discharged employee's suitability for employment are distributed for discriminatory reasons, disparate treatment of the affected employee vis-a-vis other former employees not so maligned is apparent.

The record indicates that appellant was endeavoring to develop additional factual and legal theories on dissemination of references that may or may not be compatible with *Evans.* Appellant's interrogatories, her counsel's argument to the District Court and her own deposition suggest an attempt to show interference with prospective employment by the release by appellee's personnel office of derogatory information from appellant's personnel file. The extent to which an employer may rely upon the discriminatorily-contrived personnel records of an employee no longer working for the employer, or one still engaged and presumably able to correct the falsified file, is a substantial question that we need not now address. Nor need we consider whether dissemination of references might fall within the scope of the exception, articulated in *Evans,* to the principle that the continuing impact of past discrimination does not constitute a present violation:

> This case does not involve any claim by respondent that United's seniority system deterred her from asserting any right granted by Title VII. It does not present the question raised in the so-called departmental seniority cases. See, *e. g., Quarles v. Phillip Morris,* 279 F.Supp. 505 (E.D.Va.1968).

431 U.S. at 558, n.10, 97 S.Ct. at 1889 n.10, 52 L.Ed.2d at 579 n.10. See also *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, 163 (1970); B. Schlei & P. Grossman, Employment Discrimination Law 908 (1976).

**44.** In *EEOC v. Western Publishing Co.,* 502 F.2d 599 (8th Cir. 1974), the court approved enforcement of a Commission subpoena—prompted by a charge of racially-motivated adverse employment references—for materials related to the employer's reference policies. Similarly, in *EEOC v. United States Fidelity & Guar. Co.,* 414 F.Supp. 227 (D.Md.1976), enforcement of a Commission subpoena for information relevant to investigation of "a charge of retaliation and discriminatory references" was ordered. *Id.* at 243. The court observed:

> Although [the complainant's] allegations relating to unlawful employment practices which occurred on the job were untimely for independent charge purposes, they form the basis upon which a motivation on the part of the company to retaliate against [the complainant] through bad references and recommendations in violation of Title VII may rest. It is not a violation of Title VII to provide a bad reference or recommendation if there is a nondiscriminatory basis for doing so.

*Id.* at 243–244. It is unclear whether the court regarded discriminatory references as violative of § 704(a), 42 U.S.C. § 2000e–3(a) (1976), see note 55 *infra,* rather than or in addition to § 703(a)(1), 42 U.S.C. § 2000e–2(a)(1) (1976). In *Tarvesian v. Carr Div. of TRW, Inc.,* 407 F.Supp. 336, 340–341 & n.6 (D.Mass.1976), the court, unable to locate authority on the issue at hand, declined to dismiss claims alleging dissemination of bad references in violation of § 703(a)(1). A somewhat variant theory was articulated in *Moore v. Bank of New Orleans,* 12 F.E.P.Cas. 1566, 1568 (E.D.La.1975):

> After a careful reading of the language of 42 U.S.C. § 2000e–2(a), we conclude that it does not apply to adverse employment references unless there are also other allegedly cognizable discriminatory acts that fall within Title VII, e. g., a termination or a failure to promote. However, plaintiff does state a good cause of action under § 1981.

The Tenth Circuit has recently held that advising a prospective employer that a former employee filed a sex discrimination charge against the prior employer violates § 704(a), 42 U.S.C. § 2000e–3(a) (1976). *Rutherford v. American Bank of Commerce,* 565 F.2d 1162 (10th Cir. 1977). Similarly, in *Pantchenko v. C. B. Dolge Co.,* 581 F.2d 1052 (2d Cir. 1978), at 4464–4466, the Second Circuit held that a

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or *otherwise to discriminate against any individual* with respect to his compensation, terms, conditions, or *privileges of employment*, because of such individual's race, color, religion, sex, or national origin.[45]

This broad statutory language hardly lacks a potential for intercepting discriminatory efforts by former employers to dissuade prospective employers from engaging discharged employees. That construction, it seems to us, would laudably implement the pervasive congressional objective of "equality of employment opportunities."[46] Denial of employment on grounds of sex or national origin is as repugnant to the legislative goal when induced by a former employer as when perpetrated directly by an employer with whom a job is sought.

■ Consistently with these concerns, this court has applied Section 703(a)(1) in circumstances similar to those at bar. In *Sibley Memorial Hospital v. Wilson,*[47] a male nurse prosecuted a discrimination charge against an employer for whom he had never worked or ever intended to work. The plaintiff attended to patients in private hospitals pursuant to an arrangement by which the hospitals referred a patient's request for a private nurse to a nurses' registry—an independent concern—which in turn selected a nurse who had indicated availability for work on that day. The plaintiff complained that supervisory nurses at Sibley Hospital rejected him on two occasions in successive years because the requesting patients were female. He further alleged that from 1936 to 1970 every patient whom he serviced at Sibley was male, though female nurses regularly attended persons of both sexes. Construing Section 703(a)(1) to encompass the claims advanced, we pointed out that the provision protected "any individual" rather than an "employee."[48] We noted that "nowhere are there words of limitation that restrict references in the Act to 'any individual' as comprehending only an employee of the employer,"[49] nor could we perceive "any good reason to confine the meaning of 'any individual' to include only former employees and applicants for employment, in addition to present employees."[50] Accordingly, we

---

plaintiff stated a cause of action under that section when he alleged that, in retaliation for his filing of discrimination charges with the Equal Employment Opportunity Commission, his former employer refused to furnish letters of recommendation for him. We have uncovered no authority indicating that discriminatory issuance of negative references could never transgress § 703(a)(1).

**45.** 42 U.S.C. § 2000e–2(a)(1) (1976) (emphasis supplied).

**46.** See *Griggs v. Duke Power Co., supra* note 43, 401 U.S. at 429, 91 S.Ct. at 853, 28 L.Ed.2d at 163.

**47.** 160 U.S.App.D.C. 14, 488 F.2d 1338 (1973).

**48.** *Id.* at 17, 488 F.2d at 1341.

**49.** *Id.*

**50.** *Id.* Former employees fall within the purview of § 703(a)(1). See *Wetzel v. Liberty Mut. Ins. Co., supra* note 19, 508 F.2d at 247; *Hackett v. McGuire Bros.,* 445 F.2d 442, 445–446 (3d Cir. 1971). Moreover, Title VII provides for the filing of administrative charges and subsequent institution of civil actions by "persons aggrieved," §§ 706(b), (f), 42 U.S.C. §§ 2000e–5(b), (f) (1976), and in determining aggrievement, reference is to be made to "the standing concepts articulated by the Supreme Court as 'injury in fact' and an interest 'within the zone of those regulated by the statute or constitutional guarantee in question.' " *Sibley Memorial Hosp. v. Wilson, supra* note 47, 160 U.S.App.D.C. at 17 n.4, 488 F.2d at 1341 n.4, quoting *Association of Data Processing Orgs. v. Camp,* 397 U.S. 150, 152–153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184, 187–188 (1970). Thus "[t]he fact that the Act purports to provide remedies for a class broader than direct employees is a strong indication that the proscriptions contemplated by Section 703(a)(1) reach beyond the immediate employment relationship." *Sibley Memorial Hosp. v. Wilson, supra* note 47, 160 U.S.App.D.C. at 17, 488 F.2d at 1341.

Even if Title VII requires some direct employment relationship—past, present or potential—see *Mathis v. Standard Brands Chem. Indus.,* 10 F.E.P.Cas. 295 (N.D.Ga.1975), that precondition is satisfied in two respects in the context of references disparaging former employees. As in *Sibley,* interference with prospective direct employment is alleged; beyond that, a nexus to past direct employment subsists. Surely an employee may reasonably expect that satisfactory service will be rewarded with

concluded that "[t]hose words should . . be given their ordinary meaning so long as that meaning does not conflict with the manifest policy of the Act." [51]

A prominent feature of that policy is assurance of "equal access to the job market." [52] So, in *Sibley Hospital* we observed:

Control over access to the job market may reside, depending upon the circumstances of the case, in a labor organization, an employment agency, or an employer as defined in Title VII; and it would appear that Congress has determined to prohibit each of these from exerting any power it may have to foreclose, on invidious grounds, access by any individual to employment opportunities otherwise available to him. To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.[53]

The considerations articulated in *Sibley Hospital* apply with equal force to discriminatorily-motivated propagation of adverse references. A former employer is solidly in position to impede a prior employee's reentry into the job market. When that influ-

ence is exerted to limit employment opportunities on grounds of "race, color, religion, sex, or national origin," [54] an evil at which Section 703(a)(1) is unequivocally aimed materializes. To be sure, Sibley Hospital's control of its premises and its status as an intermediary enabled it to bar the complaining nurse from access to requesting patients. That distinction, however, would scarcely comfort a discharged employee unable to secure work because of discriminatory references by the former employer.

Indeed, the pernicious effects of such reports might far exceed the impact of the practice condemned in *Sibley Hospital*. There the complainant's employment opportunities at other private hospitals remained unimpaired by Sibley Hospital's unlawful conduct; here the former employer might substantially foreclose a wide range of desirable job prospects. As, in interpreting Section 704(a) [55] to prohibit distribution of adverse references in retaliation for resort to statutory remedies, the Tenth Circuit has observed, " 'it is a fact of business life that employers almost invariably require prospective employees to provide the names of their previous employers as references when applying for a job. . . . [F]ormer employees could be severely handicapped in their efforts to obtain new jobs if the [prior employer] should brand them as "informers" when references are sought.' " [56]

favorable recommendations—or at least not penalized by derogatory references—upon severance of the employment. When that benefit is denied on grounds of sex or national origin, the employee has been "aggrieved" within the contemplation of Title VII. Discriminatory treatment in employment referencing thus implicates "conditions" of past employment as well as "privileges of [prospective] employment." See § 703(a)(1), 42 U.S.C. § 2000e–2(a)(1) (1976).

51. *Sibley Memorial Hosp. v. Wilson, supra* note 47, 160 U.S.App.D.C. at 17, 488 F.2d at 1341.

52. *Id.*, quoting *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 386 (5th Cir.), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971).

53. *Sibley Memorial Hosp. v. Wilson, supra* note 47, 160 U.S.App.D.C. at 17, 488 F.2d at 1341.

54. See text *supra* following note 45.

55. 42 U.S.C. § 2000e–3(a) (1976), providing:
It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

56. *Rutherford v. American Bank of Commerce, supra* note 44, 565 F.2d at 1166.

A hindrance no less severe and no less offensive ensues from discriminatorily-contrived accounts of an applicant's unsuitability for employment.[57]

 Of course, not every employment reference—though sent maliciously and productive of a devastating impact—will engender a grievance cognizable under Title VII. Only when the practice amounts to disparate treatment on the basis of "race, color, religion, sex, or national origin" [58] can the statute be invoked. Here, however, appellant has averred that, because of her sex and her husband's national origin, C&P of Maryland has communicated false and damaging reports to her prospective employers on numerous occasions, and thus has continually defeated job opportunities otherwise available to her. Proof of that claim plainly would establish a severe constriction of job-market access [59] through distinctions outlawed by Title VII. The practice alleged erects artificial barriers that Congress endeavored to foreclose and, we hold, is outlawed by Section 703(a).[60]

## C. Timeliness and Efficacy of the Discriminatory-Referencing Charges

With that determination, we turn to the question whether appellant's administrative charges of discriminatory referencing by C&P of Maryland were timely filed. We refer, of course, to the charges presented to the Equal Employment Opportunity Commission on January 22, March 10, and April 27, 1973.[61] We have already held that the referencing was sufficiently distinct from appellant's 1968 discharge to require investigation into its remediability.[62] We conclude that each administrative filing came soon enough to preserve the referencing issue for judicial resolution.

### (1) The January 1973 Charge

Appellant averred therein a practice by C&P of Maryland of maliciously and discriminatorily forestalling her employment with others enduring from the date of her discharge until that charge was filed.[63] She identified an instance of its application—involving Capital Credit Corporation—which

---

**57.** Whether statutorily-forbidden discrimination through employment references may assume forms other than falsification is a question we need not consider, for appellant alleges promulgation of untrue accounts.

**58.** See note 45 supra.

**59.** We intimate no view as to whether a single instance of job preclusion thus contrived is actionable.

**60.** We do not anticipate that this holding will induce employers to refrain in any significant degree from supplying legitimate references on former employees. That consequence has not followed from potential liability for defamation, compare Patton v. Royal Indus., Inc., 263 Cal. App.2d 760, 70 Cal.Rptr. 44 (1968), with Hoff v. Pure Oil Co., 147 Minn. 195, 179 N.W. 891, 11 A.L.R. 1010 (1920); see generally W. Prosser, Law of Torts, § 110 (3d ed. 1964), or for tortious interference with prospective economic relationships, see Bacon v. St. Paul Union Stockyard Co., 161 Minn. 522, 201 N.W. 326 (1924); Huskie v. Griffin, 75 N.H. 345, 74 A. 595 (1909); see generally W. Prosser, supra, § 124, resulting from flagrantly improper communications respecting former employees. We hasten to add that any speculative repercussions affecting legitimate business practices

that might arise from additional burdens imposed by Title VII liability cannot outweigh the concrete and present injury to congressional objectives that attends discriminatory job references.

Nor does availability of alternative state judicial remedies militate against Title VII coverage. The Act envisions coexistence of state and federal remedies when the two are compatible. See Title VII, § 708, 42 U.S.C. § 2000e–7 (1976). And when state efforts to combat employment discrimination have focused to the extent of express prohibition of invidious practices and designation of a "State or local authority to grant or seek relief from such practice[s] or to institute criminal proceedings with respect thereto," Title VII, § 706(c), 42 U.S.C. § 2000e–5(c) (1976), deferral to that authority is specifically authorized. See id. On the other hand, a state's generalized concern for prevention of torts and its provision of judicial remedies simply to that end warrants neither preliminary deferral nor displacement of Title VII coverage.

**61.** See note 30 supra.

**62.** See text supra at notes 36–43.

**63.** See text supra at note 25.

transpired in 1971.[64] We think this effort served the purpose.

 As a general rule, a Title VII claim may be premised only upon specific instances of misconduct of which the Commission is apprised within the statutorily-prescribed time.[65] When, however, a continuing discriminatory employment practice is alleged, the administrative complaint may be timely filed notwithstanding that the conduct impugned is comprised in part of acts lying outside the charge-filing period.[66] As Congress itself has said, for those "violations [that] are continuing in nature" it is appropriate to "measur[e] the running of the required time period from the last occurrence of the discrimination and not from the first occurrence." [67] Challenges to assertedly unlawful hiring [68] and promotion [69] policies are typical of those falling within the ambit of the continuing-violation principle.[70] In these related contexts, it is

---

**64.** See text *supra* at note 25. In this regard, appellant averred in her complaint in the District Court that a Capital Credit Corporation personnel officer who was processing her employment application

> telephoned [her] and wanted to know what she had done to her supervisor at the Telephone Company. [The officer] stated that when Capitol [*sic*] checked with the Telephone Company they were told that they had better not hire [her] or the Telephone Company would see that credit collection account work performed by Capitol [*sic*] would be taken away and given to some other collection agency.

First Amended Complaint ¶ 32, App. 21.

**65.** See generally note 23 *supra*.

**66.** See *Laffey v. Northwest Airlines, supra* note 19, 185 U.S.App.D.C. at 366, 567 F.2d at 473; *Macklin v. Spector Freight Sys., Inc., supra* note 23, 156 U.S.App.D.C. at 77–78, 478 F.2d at 987–988; *Wetzel v. Liberty Mut. Ins. Co., supra* note 19, 508 F.2d at 246; [1976] EEOC Compl. Man. (CCH) ¶ 4102–4103, §§ 208.1–208.2:

> A Charging Party may attack a current employment *policy* in addition to past *applications* of that policy; and, since a policy is by nature continuing, a "policy" charge always is timely filed . . . .. Thus the Commission's jurisdiction vests when it receives a charge which merely alleges the current existence of an unlawful policy. The Commission's jurisdiction does not await *proof* that the alleged policy exists in fact, or has been applied within 180 (or 300) days of the filing date. These are facts relevant to the merits of the charge, rather than to the Commission's jurisdiction to investigate it.
>
> Charges which do not specifically include the work "policy", or otherwise suggest a continuing course of conduct, normally may be read, in context, to allege a continuing, i. e., policy-type, violation. The purpose of this Section is to alert the reader to the policy/policy-application distinction and the "continuing violation" approach to seemingly untimely charges.
>
> \* \* \* \* \* \*
>
> Whether an allegedly continuing practice, i. e., a present policy, exists is, as noted above,

a question of fact. Charging Party has the burden of proceeding on whether an alleged policy in fact was extant during the 180 or 300-day period preceding the filing of the charge and/or thereafter. Barring admissions from Respondent, Charging Party must evidence sufficient specific acts (hiring acts, promotion acts, etc.) from which an underlying policy (discriminatory hiring policy, promotion policy, etc.) reasonably may be inferred. Those specific acts need not have occurred during the 180 or 300-day period; it is enough that they occurred over a period of time directly preceding the 180 or 300-day period. The Commission and the courts will infer, absent other facts, that the thus inferred policy carried over into, and in fact existed during, the 180 or 300-day period. (emphasis in original).

**67.** 118 Cong.Rec. 7167 (1972) (conference report).

**68.** See *Macklin v. Spector Freight Sys., Inc., supra* note 23, 156 U.S.App.D.C. at 77–78, 478 F.2d at 987–988; *Wetzel v. Liberty Mut. Ins. Co., supra* note 19, 508 F.2d at 246; *Boudreaux v. Baton Rouge Marine Contracting Co.,* 437 F.2d 1011, 1015–1016 (5th Cir. 1971).

**69.** See *Wetzel v. Liberty Mut. Ins. Co., supra* note 19, 508 F.2d at 246; *Clark v. Olinkraft, Inc.,* 556 F.2d 1219, 1222 (5th Cir. 1977) *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1251, 55 L.Ed.2d 772 (1978); *Cedeck v. Hamiltonian Fed. Sav. & Loan Ass'n,* 551 F.2d 1136, 1137 (8th Cir. 1977); *Rich v. Martin Marietta Corp.,* 522 F.2d 333, 348 (10th Cir. 1975).

**70.** An allegation that unfair bias permeates the personnel practices of an enterprise invokes the doctrine as well. Hence, we have declared that when "discrimination is not limited to isolated incidents but pervades a series or pattern of events which continue to within ninety days of the filing of the charge with the Commission, the filing is timely as to all similarly situated employees regardless of when the first discriminatory incident occurred." *Laffey v. Northwest Airlines, supra* note 19, 185 U.S.App.D.C. at 366, 567 F.2d at 473.

the ongoing program of discrimination, rather than any of its particular manifestations, that is the subject of attack.

 We are mindful that appellant's January, 1973, charge cited but a single instance of interference with third-party employment. Nonetheless, it made plain that the specified event was illustrative of a long-lasting pattern of like events.[71] That theme was echoed in her first amended judicial complaint.[72] Moreover, the record lends substance to the inference that appellant is endeavoring to challenge a persistent referencing policy, albeit directed only at her.[73] In her deposition, she testified that between the date of her discharge and April, 1973, she obtained some 200 interviews with prospective employers; and generally she was required to list C&P of Maryland and her former supervisor there as a reference.[74] As we understand, she attributes her constant inability to secure new employment, for which she claims to be qualified, to discriminatory reports by the company.[75]

**71.** See text *supra* at note 25.

**72.** See First Amended Complaint ¶¶ 28, 29, 34, Counts III–IV, App. 20–24; see also *id.* ¶ 53, App. 25.

**73.** That appellant describes a referencing policy not of systemic proportions but evidently confined to her might present obstacles to her case on the merits—that is, whether action taken against her truly was predicated in substantial part on her gender or her husband's national origin—but it should not defeat her claim of a continuing violation. It seems apparent that an employer might adhere to a discriminatory referencing policy in regard to one employee as readily as against a sizeable class of employees. In either situation, the relevant distinction is between isolated and sporadic outbreaks of discrimination and a dogged pattern. Put another way, it is not the number of employees oppressed that matters, but the fundamental character of the oppression. Indeed, to allow aggrieved employees to recover backpay up to the statutory two-year maximum, see Title VII § 706(g), 42 U.S.C. § 2000e–5(g) (1976), because they were victims of continuing systemic violations, but to deny that redress to a lone employee concededly subject to an ongoing practice animated by reasons condemned by Title VII, is to repudiate the statutory guaranty of rights personal to the individual. See Title VII § 703(a), 42 U.S.C. § 2000e–2(a) (1976) ("[i]t shall be an unlawful employment practice for an employer . . . to discriminate against *any* individual" (emphasis supplied)); *Barnes v. Costle*, 183 U.S.App.D.C. 90, 100, 561 F.2d 983, 993 (1977).

Moreover, in terms of the considerations underlying the statutory time bar, there is little difference between systemic discrimination and an invidious policy of narrower scope. The *sine qua non* of recovery in both instances is proof of continuation of the unlawful policy into the filing *period*; at least for that interval the employer presumably will have access to evidence that has not become stale. In either instance, the employer will escape liability for alleged applications of the policy predating the filing period—but not by more than two years for purposes of backpay—only if he can demonstrate that they were isolated or nondiscriminatory in nature. To some degree that aspect of the litigation will hinge on evidence of earlier vintage, but Congress was anxious "to give the aggrieved person the maximum benefit of the law." 118 Cong.Rec. 7167 (1972) (conference report). To that end, Congress endorsed the proposition "that certain types of violations are continuing in nature," and that in such circumstances it is appropriate to "measur[e] the running of the required time period from the last occurrence of the discrimination and not from the first occurrence." *Id.*

On the merits, too, an employee might well prevail absent a showing of similar mistreatment of others of like sex, race, color, religion or national origin. See *Barnes v. Costle, supra*, 183 U.S.App.D.C. at 100–101, 561 F.2d at 993–994 and authorities cited therein. Indeed, two or more of the criteria possessing statutory significance might coalesce to yield a narrow class of potential victims. Appellant, a woman married to a man of Arabic heritage, may well exemplify that point.

**74.** Deposition of Shirley P. C. Shehadeh, Jan. 15, 1976, at 83–84.

**75.** Ordinarily, a complainant who has remained disassociated from prior employment for a time exceeding the charge-filing period because of resignation or expulsion cannot successfully assert a continuing violation. See *Terry v. Bridgeport Brass Co.*, 519 F.2d 806, 808 (7th Cir. 1975); *Olson v. Rembrandt Printing Co.*, 511 F.2d 1228, 1234 (8th Cir. 1975); *Collins v. United Airlines, Inc.*, 514 F.2d 594, 596 (9th Cir. 1975). Thus, in *Laffey v. Northwest Airlines, Inc., supra* note 19, we observed that

[a] severing of the employment relationship ordinarily terminates a discrimination against the severed employee, and activates the time period for filing charges with the Commission concerning any violation which occurred at separation or which may have been continuing up to the date thereof. To hold other-

In these circumstances, we think the course most consistent with the remedial thrust of Title VII is to permit appellant to proceed with discovery respecting her allegations of continuing discriminatory references.[76] If she cannot adduce proof tending to show the existence of a pattern of interference extending into the January filing period, she may—perhaps in response to a motion for summary judgment—be barred from seeking recovery for earlier infractions of that nature.

#### (2) *The March and April 1973 Charges*

■ Potentially, and independently of her January, 1973, filing, appellant's administrative charges of March 10 and April 27, 1973, also sustain her suit for discriminatory

communication of disparaging references. The complaint registered with the Commission in March was of prior unlawful interference by C&P of Maryland with her efforts to secure a job with American Automobile Association. Her April accusation proclaimed that earlier that month, as a result of discriminatory conduct by the Maryland company, Reuben H. Donnelley Corporation had refused to hire her. Each of these charges suffered from some infirmity, however, and the lot of the courts is to determine just how efficacious they may be.

Indisputably, the April charge—involving Donnelley—was submitted within the period authorized by Title VII.[77] But some

---

wise would effectively read the timely-filing requirement out of the statute. 185 U.S.App.D.C. at 366, 567 F.2d at 473 (footnotes omitted). Importantly, however, we spoke of violations occurring "at separation or . . . continuing up to the date thereof." *Id.* The practices challenged in *Laffey* included provision of disparate wages, expense allowances and employee accommodations and imposition of discriminatory weight restrictions—in sum, conditions affecting existing employees. In those circumstances former employees, long removed from the area of discrimination, may properly be precluded from litigating a continuing violation. But dissemination of adverse references, by its very nature, occurs only after termination of employment. Severance of the employment relationship does not immunize the ex-employee from this kind of maltreatment but instead sets the stage for it. See *EEOC v. United States Fidelity & Guar. Co., supra* note 44, 414 F.Supp. at 233:

> The question before the Court, then, is whether that portion of the charge concerning recommendations and references was timely filed. The Court holds that it was. The issue of recommendations and references clearly continues after termination of employment and would usually not even arise *until* that time. The limitations period does not apply to continuing violations and cannot be relied on by respondent in the instant case.

(Emphasis in original). *Cf. Terry v. Bridgeport Brass Co., supra,* 519 F.2d at 808 (layoff and subsequent termination of employment do not continue beyond the latter event); *Olson v. Rembrandt Printing Co., supra,* 511 F.2d at 1234 (disparate terms of employment and constructive discharge do not continue beyond.termination of employment); *Collins v. United Airlines, Inc., supra,* 514 F.2d at 596 n.2 ("[w]e express no opinion on the question whether a

charge filed within 90 days of United's discontinuance of the 'no marriage' policy would have satisfied the [filing] requirement, *i. e.,* whether the continued existence of that policy may have constituted a continuing violation as to Collins").

76. *Cf. Egelston v. State Univ. College of Geneseo, supra* note 33:

> It may well be, of course, that appellant will be unable to demonstrate the existence of a policy of discrimination. Indeed, she may fail to prove that her own discharge was improperly motivated. These issues are, however, best decided after trial—or, at the very least, upon a motion for summary judgment . . . perhaps after discovery has taken place. But, they cannot be resolved upon a motion to dismiss this complaint. That Dr. Egelston may ultimately not prevail in her claims does not justify denying her the opportunity to litigate them.

535 F.2d at 755; *Belt v. Johnson Motor Lines, Inc.,* 458 F.2d 443, 445 (5th Cir. 1972) ("we reverse and remand for determination of what is in essence a factual question of whether Johnson Motor Lines has engaged in a discriminatory transfer policy"); *Moore v. Sunbeam Corp.,* 459 F.2d 811, 828 (7th Cir. 1972) ("district court has jurisdiction to determine whether, during the [filing period], Sunbeam was guilty of any conduct which gave rise to a Title VII claim by Moore"). See also B. Schlei & P. Grossman, *supra* note 43, at 900–901 (noting reluctance of courts to dismiss a complaint alleging continuing discrimination in general terms if there is any possibility that the plaintiff might establish the occurrence of an event within the charge-filing period).

77. The charge was filed on April 27, 1973, and it alleged an event two weeks earlier.

doubt remains as to the other. The March charge—regarding the Association—states that the incident therein alleged transpired in February, 1972.[78] In a deposition, appellant indicated that it actually took place in February or March, 1973.[79] To boot, in its motion to dismiss, C&P of Maryland acknowledged that information acquired by the Commission in its investigation and maintained in its files would set the event in February, 1973.[80] This issue, chiefly factual in character, obviously cannot suitably be resolved on appeal. And with the April charge clearly timely, the January and March charges cannot simply be ignored as untimely. Rather, the situation calls for further proceedings in the District Court to fix the date of the Association incident complained of in the March charge, and to ascertain whether the violations alleged in the January charge continued into the January charge-filing period.[81]

There is, too, an additional problem. Neither the March charge nor the April charge named C&P of Maryland formally as a respondent. That summons us to determine whether this defect, in the circumstances of the case, precludes appellant's suit against C&P of Maryland on the acts underlying those two charges.

■ Title VII authorizes a civil action against a party "named in the charge."[82] It must be remembered, however, that complaints to the Commission are to be construed liberally since very commonly they are framed by persons unschooled in technical pleading.[83] That principle is reflected in the Commission's regulations, which exact no more for a satisfactory charge than "a written statement sufficiently precise to identify the parties and to describe generally the action or practices complained of."[84]

■ ■ The principal functions of the administrative charge are to enable the Commission to provide notice to the alleged wrongdoer and to undertake conciliation.[85] While the Commission's failure actually to furnish notice[86] or to initiate conciliation efforts[87] will not bar a civil action by the

---

78. This charge originally was filed on March 10, 1973, and was amended to name C&P of Maryland formally as a respondent in September, 1974. In both original and amended form, it indicated that the discriminatory event alleged occurred in February, 1972. See EEOC Charge No. TBA3–1115, Record on Appeal (R.) vol. I & App. 38.

79. Deposition of Shirley P. C. Shehadeh, Jan. 15, 1976, at 129–148 (especially at 148).

80. Motion by Defendant Chesapeake & Potomac Telephone Company of Maryland to Dismiss Amended Complaint (Dec. 19, 1975), at 11 n.15, R. vol. I.

81. Of course, if appellant is able to establish a discriminatory referencing policy extending into the January, 1973 charge-filing period, the District Court might, in the exercise of its authority over the January, 1973 charge, redress the infractions alleged in the Association and Donnelley episodes. See *Oubichon v. North Am. Rockwell Corp., supra* note 20; *Puntolillo v. New Hampshire Racing Comm'n,* 375 F.Supp. 1089, 1093 (D.N.H.1974); *Held v. Missouri Pac. R.R. Co.,* 373 F.Supp. 996, 1001–1002 (S.D.Tex.1974); *Shannon v. Western Elec. Co.,* 315 F.Supp. 1374, 1376 (W.D.Mo.1969).

82. Title VII, § 705(f)(1), 42 U.S.C. § 2000e–5(f)(1) (1976).

83. *Tillman v. City of Boaz,* 548 F.2d 592, 594 (5th Cir. 1977); *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 462–463 (5th Cir. 1970); *Cox v. United States Gypsum Co.,* 409 F.2d 289, 290 (7th Cir. 1969); *Kaplan v. Alliance of Theatrical & Stage Employees Int'l,* 525 F.2d 1354, 1359 (9th Cir. 1975); *Pittman v. Anaconda Wire & Cable Co.,* 408 F.Supp. 286, 291–293 (E.D.N.C.1976).

84. 29 C.F.R. § 1601.11 (1977).

85. *Laffey v. Northwest Airlines, supra* note 19, 185 U.S.App.D.C. at 365, 567 F.2d at 472; *Evans v. Sheraton Park Hotel,* 164 U.S.App.D.C. 86, 92, 503 F.2d 177, 183 (1974); *Graniteville Co. v. EEOC,* 438 F.2d 32, 38 (4th Cir. 1971); *Kaplan v. Alliance of Theatrical & Stage Employees Int'l, supra* note 83, 525 F.2d at 1359.

86. See, *e. g., Healen v. Eastern Airlines,* 8 F.E. P.Cas. 917, 922 (N.D.Ga.1973); accord; *Burwell v. Eastern Airlines,* 394 F.Supp. 1361, 1367 (E.D.Va.1975). Different considerations might obtain when the Commission itself sues. See *Healen v. Eastern Airlines, supra,* 8 F.E.P.Cas. at 922 n.18. See generally B. Schlei & P. Grossman, *supra* note 43, at 774–775.

87. See, *e. g., Russell v. American Tobacco Co.,* 528 F.2d 357, 365 (4th Cir. 1975), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176

aggrieved individual, the Commission must be afforded a reasonable *opportunity* to investigate violations assertedly committed by the putative defendant.[88] That requirement is met if the charge fairly apprises the Commission that the complainant's purpose is to seek redress of statutory infractions by a particular employer,[89] and the filing will sustain a subsequent suit based on those transgressions.

An examination of appellant's March and April, 1973, administrative complaints reveals their compliance with this standard. In the March charge, appellant attributed her inability to obtain employment with American Automobile Association to information conveyed to an Association official during conversations with an executive of C & P of Maryland or, alternatively, to malicious references "by the C & P Personnel Office nearby."[90] She additionally alleged:

On February 7 there was an ad for a service representative of the Wheaton Office. I would have liked to apply but believe my efforts would be in vain due to the continued efforts of C & P to keep me from any suitable work.

C & P (I filed against them [in] January 1973 . . .) has mistreated me especially since my marriage. They were mistreating me after my pregnancy in 1968.[91]

That C & P of Maryland had a critical role in these infractions asserted could hardly have been made clearer.

Appellant's April charge, respecting the Donnelley incident, was of like tenor. It made known that it was filed "in connection with TBA3–1030,"[92] which was appellant's original administrative complaint against C&P of Maryland. That complaint had alleged that "[t]he company continues to discriminate against me in obtaining other employment . . . and has been successful on enumerous [*sic*] occasions since my termination in 1968 up until now."[93] More significantly, in the body of her charge of April, 1973, appellant stated:

I have been refused another job for which I feel I am very much qualified. . . . This recent job rejection (along with well over 200 others) is a direct result of my futile efforts to my right of pregnancy leave [and] the nationality of my husband for which prompted C & P Telephone to release me. . . .[94]

This charge plainly implicated C & P of Maryland in the violation cited. Indeed, fairly read, it attributed a huge number of interferences with employment opportunities to the Maryland company—interferences with which Donnelley, from all that ap-

(1976); *Johnson v. Seaboard Airline R.R.*, 405 F.2d 645, 648, 5 A.L.R.Fed. 313, 319 (4th Cir. 1968), *cert. denied*, 394 U.S. 918, 89 S.Ct. 1189, 22 L.Ed.2d 451 (1969); *Dent v. St. Louis-San Francisco R.R.*, 406 F.2d 399, 402–403 (5th Cir. 1969), *cert. denied*, 403 U.S. 912, 91 S.Ct. 2219, 29 L.Ed.2d 689 (1971); *Choate v. Caterpillar Tractor Co.*, 402 F.2d 357, 360–361, 4 A.L.R. Fed. 823 (7th Cir. 1968).

**88.** See *Johnson v. Seaboard Airline R.R., supra* note 87, 405 F.2d at 649; *Georgia Power Co. v. EEOC*, 412 F.2d 462, 466 (5th Cir. 1969); *Kaplan v. Alliance of Theatrical & Stage Employees Int'l, supra* note 83, 525 F.2d at 1359; *Sciaraffa v. Oxford Paper Co.*, 310 F.Supp. 891, 897 (D.Me.1970); *Bernstein v. National Liberty Int'l Corp.*, 407 F.Supp. 709, 715 (E.D.Pa.1976). The record does not indicate what, if any, investigation was undertaken by the Commission pursuant to appellant's charges.

**89.** See text *supra* at note 84.

**90.** EEOC Charge No. TBA3–1115, R. vol. I.

**91.** *Id.*

**92.** EEOC Charge No. TDC3–1257, App. 34. *Cf. Tillman v. City of Boaz, supra* note 83, 548 F.2d at 594 (letter incorporated by reference into charge resorted to in construction of charge as implicating a party defendant).

**93.** EEOC Charge No. TBA3–1030, App. 42.

**94.** EEOC Charge No. TDC3–1257, App. 34. *Cf. Bernstein v. National Liberty Int'l Corp., supra* note 88, 407 F.Supp. at 716 (parent corporation not "named in the charge" when plaintiff did not "set forth factual allegations stating that [parent corporation] as well as [the subsidiary] was discriminating against her[;] . . . not only [was] it clear that the EEOC never actually investigated or attempted to conciliate any charge against [the parent], but it [was] also clear that the EEOC never had an *opportunity* to do so as there were no factual allegations against [the parent] upon which to base an investigation") (emphasis in original).

pears, could not have been involved. The naming of the Maryland company in the body of the charge amid a description of events ineluctably pointing to its discriminatory obstruction of access to employment indubitably afforded the Commission ample opportunity to investigate the violations laid at the company's doorstep.

In sum, appellant's first amended complaint contains allegations which, if proved, would warrant relief pursuant to Title VII. Prior to her arrival at the courthouse, she seasonably presented to the Commission at least some claims of discriminatory interference with prospective employment. We conclude then, that dismissal of that complaint was error.

### III. THE SECOND AMENDED COMPLAINT

■ We are satisfied, however, that the District Court properly refused appellant leave to file her second amended complaint.[95] That pleading incorporated a right-to-sue letter pertaining to a charge lodged with the Commission on December 18, 1975. The charge recounted the substance of accusations made in appellant's earlier filings, and complained of the disposition of her "latest application" for a job with the Maryland and District of Columbia telephone companies on September 17, 1975.[96]

Appellant contends that this charge was a timely challenge to a discriminatory practice occurring on the date last mentioned. But nowhere in the charge or in her second amended complaint does appellant assert that she was wrongfully denied employment on the occasion specified,[97] nor does she allege discriminatory processing of her application by undue delay or other means. She simply avers that she submitted the

application, and that, without more, does not show any violation or warrant any sort of recovery under Title VII.[98] It follows that the District Court acted well within its discretion in disallowing the addition of this unripe episode to the already complicated state of affairs.

Our conclusions may be briefly summarized. Appellant is entitled to proceed on her claims of discriminatory communication of pejorative employment references. Consequently, the District Court's dismissal of appellant's first amended complaint must be reversed and the case remanded for further proceedings. On the other hand, appellant's second amended complaint was rightly rejected, and on that aspect of the litigation, we affirm.

*So ordered.*

---

**95.** See notes 12, 17 *supra* and accompanying text.

**96.** EEOC Charge, Dec. 18, 1975 (unnumbered), App. 49–50.

**97.** Indeed, in an affidavit supporting a motion for reconsideration, appellant reveals that C&P of Maryland did not act on her application until

five months after she complained to the Commission. App. 62–64.

**98.** We do not suggest that an aggrieved party need always await finalization of discriminatory activity before filing an administrative charge and bringing suit. We hold only that allegation of an actual grievance is a prerequisite to eligibility for relief.