Ivan WARE, Plaintiff,

v.

**HOWARD UNIVERSITY, INC., Defendant.**

**Civ. A. No. 90–1424–OG.**

United States District Court, District of Columbia.

March 17, 1993.

Conrad D. Philos, Vienna, VA, and Thomas A. Mauro, Washington, DC, for plaintiff.

Susan L. Riley, Office of Gen. Counsel, Howard University, Washington, DC, for defendant.

## MEMORANDUM OPINION

GASCH, Senior District Judge.

Plaintiff, a Howard University employee for the past eighteen years, has filed suit in this Court alleging that Howard University has discriminated against him based on his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.[1] Specifically, plaintiff asserts that Howard University violated the ADEA by failing to promote him to the position of Director of Auxiliary Enterprises in 1983, by demoting him in 1986, and by again failing to promote him to the position of Director of Auxiliary Enterprises in 1987. Defendant denies these assertions and contends that plaintiff was passed over for promotion and transferred out of his position for reasons which are unrelated to his age.

Trial by Court commenced on November 9, 1992, and concluded on November 12, 1992.[2] The parties thereafter submitted, in addition to their pretrial briefs and memoranda, proposed findings of fact and conclusions of law. The Court's findings of fact and conclusions of law, based on its evaluation of the credibility of the witnesses and the exhibits received in evidence, are set forth below.

## FINDINGS OF FACT

1. Plaintiff, Ivan Ware, was appointed to the position of "Analyst" in the office of the Director of Auxiliary Enterprises ("DAE") at Howard University in July of 1975.[3] The office of the DAE operated under the authority of the Vice–President for Business and Fiscal Affairs, and it was responsible for the management and control of the university food services, the bookstores, the post office, the vending and ticket operations.

2. Prior to his appointment, plaintiff spent over twenty-five years in the United States Air Force, where, among other duties, he managed and supervised food service, postal service, a bookstore and sales and concession operations. This experience provided plaintiff with excellent training for his work in the office of the DAE at Howard University.

3. In 1979, plaintiff was promoted to the position of "Management Analyst" in the office of the DAE. Shortly thereafter, he began to function as an assistant to the Director. In July, 1981, he was formally appointed to the position of "Assistant Director," which carried an HA salary grade of 13.[4]

4. In March of 1983, Mr. James Hurd, who had served as DAE for eighteen years, submitted a letter to Dr. Caspa Harris, who was then Vice–President for Business and Fiscal Affairs, declaring his intent to resign as DAE on June 30, 1983, in accordance with the Howard University Employee (Non–Faculty) Handbook's "normal retirement date." Mr. Hurd recommended that Dr. Harris appoint plaintiff to replace him as DAE.

5. After submitting his letter of recommendation, Mr. Hurd periodically checked

---

1. Plaintiff filed an initial grievance with the Howard University Equal Opportunity Office on July 17, 1987. The grievance was denied on October 8, 1987. Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission on December 15, 1987, which was denied on June 12, 1989. Plaintiff then filed an administrative appeal, which was denied on September 20, 1989. He filed his complaint in this Court on June 18, 1990.

2. Although plaintiff had a statutory right to a jury trial under 29 U.S.C. § 626(c)(2), he never requested a jury trial and consented to a trial by the Court.

3. The parties have stipulated to the fact that plaintiff worked in this capacity prior to his formal appointment. See Stipulation of Fact No. 1.

4. The HA Salary System refers to the Howard University wage and salary schedule used for staff employees.

with the office of the Vice–President for Business and Fiscal Affairs to determine whether the DAE position vacancy had been posted. The vacancy was never posted.

■ 6. Mr. Karlyle Pervine, a general contractor who submitted an unsuccessful bid to run the University Bookstore in 1983, testified that Dr. Harris' Executive Assistant, Alexander Chalmers, was aware of the fact that plaintiff sought the DAE position. According to Mr. Pervine, Mr. Chalmers was not receptive to plaintiff's pursuit of the DAE position, and told Mr. Pervine that he planned to "put [plaintiff] in a corner and leave him." Mr. Chalmers also told Mr. Pervine that Mr. Jaime Negron, the Director of the University Bookstore Systems, had been previously promised the DAE position.[5]

7. Contrary to Mr. Hurd's letter of recommendation, Dr. Harris appointed Mr. Jaime Negron to the position of "Acting Director of Auxiliary Enterprises," with final appointment conditioned upon the President's approval.

8. On June 21, 1983, Dr. Harris wrote Mr. Negron a letter informing him of his new appointment. Dr. Harris also wrote, "[u]pon completion of your academic work for a Bachelors Degree, you will be given consideration for appointment to the Director's position on a permanent basis at the full annual salary rate."

9. At the time of his appointment, Mr. Negron was forty-three years of age and plaintiff was sixty years of age.

10. The Court finds that Mr. Negron's appointment was not in compliance with the "Statement of Qualifications" listed in the DAE "Position Description" which required, *inter alia*, that applicants possess a college degree. The statement also expressed a preference for a candidate with a graduate degree in business administration (an M.B.A.). Unlike the plaintiff, Mr. Negron possessed neither a college degree nor an M.B.A. at the time of his 1983 appointment.

11. After he appointed Mr. Negron to DAE, Dr. Harris offered plaintiff Mr. Negron's former job as Director of the University Bookstore Systems, which carried a higher salary grade than Assistant Director of Auxiliary Enterprises. Plaintiff rejected the offer for three reasons: First, he considered the Director of Bookstores position subordinate to his current position as Assistant DAE. Second, he believed that acceptance of the offer would constitute acquiescence in the appointment of Mr. Negron as DAE. Third, he did not want to inherit the financial "mess" which Mr. Negron had allegedly created at the bookstore.

12. Shortly after Dr. Harris appointed Mr. Negron to the position of Acting DAE, he rescinded the appointment.

13. On July 11, 1983, Dr. Harris wrote plaintiff a letter informing him that the DAE position had been vacated and would not be filled "for an indefinite period." Dr. Harris informed plaintiff that the Director of the University Bookstore Systems would no longer report to the office of the DAE but would report to Mr. Chalmers in the office of the Vice–President for Business and Fiscal Affairs. Dr. Harris also instructed plaintiff to continue to work as the Assistant DAE, and to report to Mr. Chalmers since the DAE position would not be filled.

14. At the time of his revocation of the appointment of Mr. Negron to Acting DAE, Dr. Harris did not inform plaintiff of the reason for vacating the DAE position. He testified at trial, however, that he took this action because a hiring freeze had been imposed by a special task force on the university's deficit. Dr. Harris testified that the task force, which he chaired, specifically recommended that the DAE position be frozen. He further testified that he did not believe it

---

5. Mr. Pervine's testimony concerning Mr. Chalmers' two statements was admitted without objection by defendant. In any event, the statements constitute vicarious admissions of a party opponent: the first statement confirm's defendant's plan to separate plaintiff from senior management (*see* Finding of Fact 27, *infra*); the second statement admits Mr. Negron was prese- lected for the DAE position (*see* Finding of Fact 32, *infra* ). The statements are admissible under Fed.R.Evid. 801(d)(2)(D), because they were made by "the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."

was necessary to tell plaintiff his reason for freezing the position.

15. The Court finds Dr. Harris' explanation for the sudden revocation unpersuasive. Defendant failed to produce any documentary evidence which substantiated Dr. Harris' testimony that a university hiring freeze was instituted in 1983. Defendant did submit Howard University budgets which showed both that total spending on Auxiliary Enterprises and total salaries for the office of the DAE decreased from 1983 to 1987. However, it would be unreasonable for the Court to extrapolate from these statistics that a hiring freeze had actually been imposed. Had there been such a freeze, the Court believes it would have been documented.

16. Dr. Harris' testimony concerning the alleged hiring freeze on staff positions is contradicted by former President Cheek's July 1, 1985, memorandum to the university community. This memorandum reorganized the office of the Vice–President for Business and Fiscal Affairs and, more importantly, created four new senior level middle management positions in that office. The creation of these new positions casts doubt on Dr. Harris' testimony.

17. The Court finds that Dr. Harris' testimony regarding the budget freeze is further contradicted by the deposition testimony of Mr. Arthur Newman, the former Director of Personnel.[6] Mr. Newman testified that he had personal knowledge that certain high level university officials received "secret deals" during the time period when Dr. Harris claims to have imposed austerity measures.

18. The Court finds that Mr. Newman's testimony was corroborated by Ms. Early Doss. Ms. Doss is the former Assistant to the Vice–President for Business and Fiscal Affairs, Assistant Treasurer and Director of Cash Management and Investments. Ms. Doss testified that she had personal knowledge of some unusual payments which were made to retiring vice-presidents and other senior level officials in 1987. She also testified that in 1990, the General Counsel, Mr.

Bernstein, received a $214,500.00 payment through a "special" or "supplemental" agreement that was not included in his retirement package.

19. Based on the testimony of Ms. Doss and Mr. Newman, the Court infers that, contrary to Dr. Harris' testimony, the university failed to impose employment austerity measures.

20. Because the position of DAE remained vacant after Dr. Harris rescinded his appointment of Mr. Negron, plaintiff performed the functions of the DAE from July 1983 to December 1986.

21. Although plaintiff's responsibilities increased during this time period, he received no additional compensation. Plaintiff brought this disparity to the attention of Mr. Clifford Martin, then Assistant Vice–President of Human Resources, by Memorandum dated June 30, 1986. Mr. Martin responded by advising plaintiff to raise the matter with Dr. Harris.

22. In October 1986, plaintiff learned that he would soon be transferred, along with two of the remaining functions of the office of the DAE (food services and ticket sales), to the office of the Dean for Student Life and Activities.

23. On October 27, 1986, plaintiff wrote a letter to Dr. Harris in which he objected to the proposed transfer and requested that he be given "consideration for career advancement opportunities commensurate with [his] education, training, and extensive experience." Dr. Harris did not respond to plaintiff's letter.

24. On December 3, 1986, Alexander Chalmers informed plaintiff that the transfer to the office of the Dean for Student Life and Activities ("Student Affairs") had been formally approved. Plaintiff's position was retitled "Assistant Director for Auxiliary Services," and he was instructed to report directly to the Director of the University Center.

25. Dr. Harris testified that food services and ticket sales were transferred to the office

6. Mr. Newman is now deceased and his deposition testimony was both published to the Court and admitted into evidence.

of the Dean for Student Affairs based on the recommendation of the university's auditors, Peat, Marwick and Mitchell.

26. Dr. Harris further testified that, to the best of his knowledge, plaintiff was not demoted as a result of his 1986 transfer to Student Affairs.

27. The Court finds that although plaintiff's involuntary transfer to Student Affairs had no effect on his HA grade level, it constituted a *de facto* demotion for the following reasons: First, the transfer substantially diminished plaintiff's responsibilities. Plaintiff, who had previously been responsible for oversight of all of the DAE office functions, was reduced to supervising only two of the functions. Second, plaintiff no longer supervised other employees but was limited to performing "menial" tasks. Third, plaintiff no longer reported directly to the office of the Vice–President for Business and Fiscal Affairs but, rather, to the Director of the Student Center, a lower echelon in the university chain of command. Finally, the Court credits plaintiff's testimony that the transfer separated him from upper levels of management and thereby decreased, if not eliminated, his opportunities for future promotion.

28. On July 1, 1987, Dr. Harris re-established the position of DAE and appointed Mr. Negron to serve as the new DAE.

29. Mr. Negron's appointment to DAE increased his HA grade from 14—step 8 to 16—step 4, and his annual salary rose from $55,703.00 to $61,255.00.

30. At the time of the appointment, Dr. Harris did not supply a reason for the sudden re-establishment of this position. He testified at trial, however, that he re-established the position because of his own imminent departure from the university. Dr. Harris explained that his replacement had virtually no experience managing the finances of a university, and that the President wanted a DAE in place before Dr. Harris departed from Howard University. Dr. Harris testified that in his view, Mr. Negron was more qualified than plaintiff to assist the new Vice–President for Business and Fiscal Affairs in managing Auxiliary Enterprises.

31. The Court finds that Dr. Harris' explanation for his sudden reinstitution of the DAE position lacks credence. There is no evidence that Mr. Negron was appointed DAE to provide managerial assistance to the new Vice–President for Business and Fiscal Affairs. On the contrary, Mr. Negron never performed the managerial responsibilities of DAE but continued to manage only the university bookstore.

32. Dr. Harris' 1987 appointment of Mr. Negron to the DAE position was practically contemporaneous with Mr. Negron's receipt of a bachelor's degree. At trial, Dr. Harris denied that he re-established the position because Mr. Negron had earned his college degree. However, in view of the fact that Dr. Harris had told Mr. Negron in 1983 that he would be considered for final appointment to DAE "[u]pon completion of [his] academic work for a Bachelors Degree," [7] and the fact that Mr. Negron was appointed DAE shortly after he received his bachelors degree, the Court finds that Dr. Harris preselected Mr. Negron for the DAE position.

33. Dr. Harris' re-establishment of the DAE position was neither posted nor announced. Dr. Harris' failure to post the position denied plaintiff the opportunity to formally submit an application.

34. Dr. Harris testified that he did not post the 1987 vacancy for the DAE position because he was empowered to appoint to HA levels 16 and 17 without posting. In addition, he testified there was insufficient time to post a position vacancy because of his own imminent departure from the university.

35. The Court finds that although Dr. Harris may have believed he had the power to appoint Mr. Negron without posting a position vacancy, the appointment was contrary to Howard University regulations, procedures and policy.[8] Mr. Arthur Newman,

---

7. *See* Finding of Fact 8, *supra.*

8. It is well established that institutions are bound by the very regulations which they promulgate. *See Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), discussed *infra,* n. 13.

the then Director of Personnel in charge of vacancy posting, testified that all vacancies for staff positions at Howard University must be posted. The only exception to this rule is for employees who report directly to the President. Because the DAE reports directly to the Vice–President for Business and Fiscal Affairs—not the President—the Court finds that a position vacancy should have been posted.

36. Mr. Newman further testified that when the university's posting procedures are ignored, the Personnel Division withholds its concurrence and merely "notes" the appointment. Mr. Negron's 1987 appointment to DAE was "noted."

37. Section 1.7 of Howard University's Employee Handbook provides that promotions and transfers of staff employees are to be guided by a performance appraisal system. One of the purposes of the system was to create a performance record that could be considered in promotion and transfer decisions. Mr. Newman, who authored Section 1.7, testified that the system represented Howard University's "policy" on performance. However, he also testified that Dr. Harris and Mr. Martin successfully thwarted his efforts to implement the program.

38. In his written recommendation, Dr. Harris justified the appointment of Mr. Negron to DAE on the ground that Mr. Negron

> meets all [of] the professional, experience and educational qualifications for the position. His performance at the university has been excellent and he is well suited in all aspects to manage those auxiliary services in the Division of Business and Fiscal Affairs.

39. The Court finds that Dr. Harris' justification for the appointment was factually inaccurate. First, Mr. Negron did not meet "all" of the educational qualifications for the DAE position. The "Statement of Qualifications" for the DAE position expressed a preference for candidates with masters degrees in business administration (M.B.A.'s). Unlike the plaintiff, Mr. Negron had not received an M.B.A.

40. The Court also finds that Mr. Negron failed to meet the "Statement of Qualifications" requirement that the DAE applicant have the "[a]bility to get along well with people." Unlike plaintiff, Mr. Negron was the subject of numerous personnel complaints. One complaint, signed by fourteen bookstore employees, alleged, *inter alia,* the following: Mr. Negron exhibited a "dictatorial managerial style"; made "snap judgments based on inconclusive evidence," which resulted in "false accusations"; he was "very condescending" towards the suggestions of his subordinates; he had "no respect for his employees"; he ordered people rather than asked them to perform tasks; and he was "essentially an ineffective leader." Plaintiff's Exhibit J. Although this complaint was filed on October 11, 1989, after Mr. Negron's appointment to DAE, Ms. Margaret Nash, who worked as Mr. Negron's principal assistant, testified that the complaint described problems which existed as early as 1983. Based on this complaint and other remarkably similar complaints, the Court finds that Mr. Negron failed to demonstrate an ability to get along well with people. Thus, Dr. Harris' comment in the 1987 appointment justification, that Mr. Negron met "all" of the DAE qualifications, was not based on fact.

41. Dr. Harris testified that the reason he appointed Mr. Negron over plaintiff in 1987 was that Mr. Negron was better qualified because he had supervised an entire unit. The facts do not support this testimony.

42. The Court finds that Mr. Negron had not in fact supervised an entire unit, but had directly managed only one of three bookstores. Furthermore, his performance in that capacity was dismal. The testimony of plaintiff, Mr. Pervine and Mr. Abraham Thomas, a former bookstore manager, established that, among other problems, Mr. Negron substantially worsened the bookstore's problem of amassing "dead inventory." That is to say, Mr. Negron ordered unnecessary books which were not returned to the publishers in a timely fashion and which, eventually, became nonreturnable. Plaintiff, Mr. Pervine, Mr. Thomas and even Dr. Harris testified that the university lost substantial

sums of money through nonreturnable or "dead" inventory. The Court finds that, although Mr. Negron did not originate the problem of dead inventory, he added to it substantially. Thus, he was not, based on the undisputed evidence in the case, well qualified to serve as the new DAE.

43. The Court also rejects Dr. Harris' explanation for his decision to promote Mr. Negron over plaintiff because, based on the evidence in this case which the Court accepts, plaintiff was more qualified than Mr. Negron to serve as the new DAE. There can be no legitimate dispute that plaintiff was ideally suited to perform the duties of DAE. As previously pointed out, plaintiff's prior experience in the military was directly relevant to the functions of the office of the DAE. Moreover, plaintiff had spent his entire career at Howard University working in the office of the DAE, and had been recommended for the position by the former DAE, Mr. Hurd. Most importantly, from 1983 through 1986, while the DAE position remained vacant, plaintiff performed the duties of the DAE in his capacity as Assistant DAE. Mr. Negron, in contrast, had managed only one facet of the office of the DAE—one of the bookstores. Therefore, it cannot be said that Mr. Negron was more qualified than plaintiff to serve as the new DAE. Whatever Dr. Harris' reason for preferring Mr. Negron over plaintiff, he simply stated the conclusion and omitted the supporting data.

44. At trial, Dr. Harris vehemently denied that he decided not to promote plaintiff because he disliked his management style. When asked whether he told others that he objected to plaintiff for the DAE position because of plaintiff's "militaristic management style," Dr. Harris replied, "Absolutely not. That is absolutely false." The Court finds this denial unworthy of belief. At a pretrial hearing, the Court asked defendant's counsel, Ms. Riley, what she expected the substance of Dr. Harris' testimony would be. Counsel responded, "[t]hat the plaintiff had a militaristic management style that conflicted with the management style that [Dr. Harris]

wanted in operation over auxiliary enterprises." The Court doubts that Ms. Riley would have made such a specific proffer without any factual basis therefor. Moreover, when confronted with this statement on cross-examination, Dr. Harris failed to offer any credible explanation.

45. The Court finds that Howard University's equal employment opportunity policies were insensitive to discrimination based on age. First, the Howard University Employee Handbook (Non–Faculty) of 1980 proscribes discrimination in employment based on "race, color, national and ethnic origin, sex, marital status, religion or handicap," but omits any reference to age.[9] Second, the Handbook mistakenly provides that "[n]onfaculty employees may be compelled to retire at age 70 in keeping with federal law." Third, despite a directive from the Equal Employment Opportunity Commission that it must revise its Handbook "to clearly indicate there is no age cap with respect to employment," Howard University has taken no action to update its Handbook or practices to reflect accurately the law.

46. The Court finds that Howard University's outdated age policies directly affected the promotion decisions of upper management. Based on the testimony of Mr. Newman, the Court finds that employees over the age of sixty, or within ten years of retirement, were rarely promoted to higher positions. Even Mr. Newman, who had served as the Director of Personnel, was denied promotion once he reached the age of sixty-four. Mr. Newman applied for the position of Assistant Vice–President for Human Resources in May of 1985. The duties of this position were almost identical to Mr. Newman's duties as Director of Personnel. Mr. Newman testified that, in essence, the Assistant Vice–President position was merely a retitled version of his own position. Mr. Newman further testified that after his application for the position was denied, and a younger man had been appointed, he asked Dr. Harris whether he had been considered for the promotion. Dr. Harris informed him

---

**9.** There are two editions of the 1980 employee handbook. The second edition, which was published sometime in 1990, includes age in its general prohibition against discrimination. The first edition was the only edition extant during the relevant time period in this case, 1983–1987.

that he had not been considered because he was too close to retirement.[10] The Court credits this testimony.

47. The Court finds that Howard University's outdated age policies were also manifest in the retirement decisions of employees. The Howard University "Benefit & Pension Handbook" provides that an employee's "normal retirement date" is the June 30th after the employee's 65th birthday. Dr. Harris testified that the term "normal retirement date" refers to the time when an employee can retire with full benefits. However, the "Benefit & Pension Handbook" also provides that "you can continue working after normal retirement, but you'll need permission if you want to work past the June 30th after you reach age 70." Moreover, Mr. Arthur Newman testified that age sixty-five was essentially a mandatory retirement date, which was extended only if a Vice–President recommended and the President approved continued employment. Mr. Newman asserted that once an employee reached age sixty-five, he or she assumed at-will employment status. The Court credits Mr. Newman's testimony and finds that the standard practice at Howard University was compulsory retirement at age sixty-five.

48. Mr. Newman's testimony on mandatory retirement gives rise to an inference that Howard University employees in their early sixties were not seriously considered for promotion to upper or senior management positions.

49. The purpose of President Cheek's July 1, 1985 memorandum to the university community (*See* Finding of Fact ("FOF") 16, *supra* ), in which he reorganized the office of the Vice–President for Business and Fiscal Affairs, was to "put in place an organizational structure which can provide strong and effec-

tive management services for the next decade." Based on the testimony of plaintiff and Mr. Newman, the Court finds that the President's statement manifested the dominant decision-making objective of upper levels of management. The Court further finds that this objective precluded any realistic chances of promotion for older employees within ten years of their "normal retirement date."

50. In July 1991, Mr. Negron retired from the university under an early retirement plan. By the time of his retirement, Mr. Negron's salary had risen to approximately $71,000.00.

## CONCLUSIONS OF LAW

### 1. Continuing Violation Of The ADEA

■ The Court must first address whether plaintiff has properly alleged a "continuing violation" of the ADEA such that his claims are not barred by the statute of limitations. As discussed above, plaintiff has charged defendant with age discrimination based on defendant's alleged: 1) failure to promote him to the DAE position in June 1983; 2) demotion to an inferior position in December 1986; and 3) failure to promote him to the DAE position in July 1987. Under the ADEA, age discrimination claims must be filed in the district court within two years of the accrual of the cause of action, or within three years if the violation is shown to be willful. 29 U.S.C. § 626(e)(1) (incorporating the time limitations set forth in 29 U.S.C. §§ 255 and 259). Because plaintiff filed his complaint in this Court on June 18, 1990, only his 1987 claim of discrimination lies within the three-year statute of limitations.[11] However, if plaintiff has properly alleged a continuing discriminatory employment practice, his complaint may be timely filed de-

10. This testimony was admitted without objection by defendant. The statement constitutes a vicarious admission of a party opponent because it admits to the university's practice of not promoting employees within ten years of retirement age. The statement is admissible under Fed. R.Evid. 802(d)(2)(D) because it was made by "the party's agent or servant [Dr. Harris] concerning a matter within the scope of the agency or employment, made during the existence of the relationship." In addition, the statement is inconsistent with Dr. Harris' direct examination testimo-

ny that Mr. Newman was not considered for promotion because he sought early retirement. As a prior inconsistent statement, it would have been admissible during cross-examination of Dr. Harris to impeach his credibility.

11. The Court assumes the applicability of the three-year statute of limitations before addressing, *infra*, whether plaintiff has shown a willful violation of the ADEA.

spite the fact that the conduct impugned consists in part of acts lying outside of the charge-filing period. *Shehadeh v. Chesapeake and Potomac Telephone Co.,* 595 F.2d 711, 724 (D.C.Cir.1978). That is, if plaintiff has correctly asserted a continuing violation, the statute of limitations begins to run from the date of the last occurrence of discrimination and not from the first occurrence. *Id.*

A continuing violation may be found to exist where the alleged discrimination "is not limited to isolated incidents but pervades a series or pattern of events." *Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 473 (D.C.Cir.1976), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). That is to say, the plaintiff alleges a continuing violation only if he or she attacks an ongoing program of discrimination rather than any of its specific manifestations. *Shehadeh,* 595 F.2d at 725; *accord Clark v. Olinkraft Inc.,* 556 F.2d 1219, 1222 (5th Cir. 1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1251, 55 L.Ed.2d 772 (1978). "[T]he relevant distinction is between isolated and sporadic outbreaks of discrimination and a dogged pattern." *Shehadeh,* 595 F.2d at 725 n. 73.

The applicability of the continuing violation theory in the instant case partly depends on how the Court characterizes defendant's 1987 promotion of Mr. Negron to the DAE position. In *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977), the Supreme Court held that a continuing violation of Title VII of the Civil Rights Act does not exist where a subsequent nondiscriminatory act of an employer gives present effect to past discrimination.[12] Thus, if this Court views the 1987 appointment of Mr. Negron to the DAE position as a completely neutral event which merely effectuates past discrimination, plaintiff cannot avail himself of the continuing violation theory. *See also Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980) (the college's allegedly discriminatory denial of tenure—not the plaintiff's neutral and nondiscriminatory discharge one year later—was the event triggering the statute of limitations). Furthermore, plaintiff's mere continuity of employment at Howard University, without more, is insufficient to bring plaintiff's cause of action under the umbrella of the continuing violation theory. *Id.; United Air Lines, Inc. v. Evans,* 431 U.S. at 558, 97 S.Ct. at 1889.

The Court must therefore determine whether the 1987 promotion of Mr. Negron to the DAE position was a discrete and neutral act, or whether it was discriminatory and part of a pattern or plan of discrimination. This is a question of fact. *Bruno v. Western Electric Co.,* 829 F.2d 957, 961 (10th Cir. 1987). If the Court finds that defendant's intent from 1983 to 1987 was to take whatever action was necessary to promote Mr. Negron to the DAE position over plaintiff, then plaintiff has properly alleged a continuing violation. *See id.*

The Court holds, for the reasons set forth below, that Dr. Caspa Harris, the former Vice-President for Business and Fiscal Affairs, and his Executive Assistant, Alexander Chalmers, engaged in an intentional, long-term and continuing plan to ensure that Jaime Negron would be appointed to the position of DAE over plaintiff. Whether or not they discriminated against him based on his age is the subject of discussion in Part 2 of this opinion, *infra.* However, it is clear to the Court that Dr. Harris and Mr. Chalmers engaged in a pattern of activity, beginning in June 1983 and ending with Mr. Negron's final appointment in July, 1987, which guaranteed Mr. Negron's appointment to the po-

---

**12.** In *Evans,* United Air Lines discharged the plaintiff, a flight attendant, based on an illegal "no marriage" rule. United later rehired the plaintiff but denied her seniority credit for her previous service. The plaintiff conceded that her discriminatory discharge claim was time-barred, but complained that the subsequent denial of seniority credit constituted a continuing violation of Title VII. *Id.,* 431 U.S. at 557–558, 97 S.Ct. at 1888–89. The Supreme Court rejected the argument on the ground that United's seniority credit system was neutral in application: all United employees who broke from continuous service were denied seniority credit for their previous employment. *Id.* at 558, 97 S.Ct. at 1889. Although the seniority system gave present effect to a past violation, it did not itself constitute a violation and, therefore, did not perpetuate a continuing violation of Title VII. *Id.*

sition and eliminated plaintiff from consideration.

The first clue that Mr. Negron had been preselected for the DAE position came in June 1983 when Dr. Harris appointed Mr. Negron "Acting Director." This appointment was suspect for many reasons. First, it was contrary to the express recommendation of the incumbent DAE, Mr. Hurd. Second, it was inconsistent with the "Statement of Qualifications" for the DAE position because Mr. Negron, unlike plaintiff, possessed neither a college degree nor an M.B.A. Third, the position vacancy was not posted—in violation of Howard University procedure—which gives rise to an inference that Dr. Harris and Mr. Chalmers had already decided whom to appoint. Fourth, the testimony of Mr. Pervine—that Mr. Negron had been promised the position—corroborates the Court's inference that Mr. Negron was preselected. Fifth, and perhaps most importantly, Dr. Harris quickly vacated his appointment of Mr. Negron to Acting DAE and froze the DAE position. Although he offered no explanation for this action in 1983, he testified at trial that he vacated the appointment for budgetary reasons. For the reasons set forth in Findings of Fact 14–19, *supra*, the Court concludes that Dr. Harris vacated the 1983 appointment of Mr. Negron for reasons unrelated to austerity. Rather, it became apparent to Dr. Harris that Mr. Negron's lack of a college degree was a serious impediment to his final appointment to the DAE position. *See* FOF 8.

The second event which facilitated Mr. Negron's final appointment over plaintiff was the 1986 transfer of plaintiff from the Assistant DAE position to the office of the Dean for Student Life and Activities. Although the transfer did not diminish plaintiff's salary grade, it was tantamount to a demotion: plaintiff's overall responsibilities were reduced; he was limited to performing menial tasks; and, he reported to a lower echelon in the university chain of command. Moreover, the evidence shows that the purpose of the demotion was to keep plaintiff out of contention for the DAE position. To be sure, when Dr. Harris reversed himself and vacated the 1983 appointment, he did not abandon his plan to someday appoint Mr. Negron to DAE. Instead, he determined that the most prudent way to implement his plan was to wait for Mr. Negron to earn a college degree, and to destroy plaintiff's viability for promotion to the position. The latter was accomplished by transferring plaintiff to Student Affairs, where he had little responsibility, and where he was isolated from contact with the upper levels of management.

The nexus between the unsuccessful 1983 appointment and the 1986 demotion is apparent: the events in 1983 show that Dr. Harris' intent was to place Mr. Negron in the DAE position; the 1986 demotion of plaintiff paved the way for this appointment once Mr. Negron achieved the minimum educational requirements for the position. The critical question, however, is whether these two events, both of which lie outside of the three-year statute of limitations, are sufficiently related to the 1987 appointment of Mr. Negron to DAE to warrant the application of the continuing violation theory.

Unlike *United Air Lines, Inc. v. Evans*, 431 U.S. at 558, 97 S.Ct. at 1889 and *Delaware State College v. Ricks*, 449 U.S. at 257–58, 101 S.Ct. at 503–04, the subsequent act attacked by the plaintiff in this case, to-wit, the 1987 appointment of Mr. Negron, did not merely give present effect to past discrimination. Moreover, the 1983, 1986 and 1987 acts complained of were not discrete and wholly separate events. *Cf. Milton v. Weinberger*, 645 F.2d 1070, 1076 (D.C.Cir.1981) (where plaintiffs sought relief from specific, unrelated instances of discrimination). Rather, the 1987 appointment of Mr. Negron was rife with evidence that he had been preselected. Furthermore, the appointment climaxed a series of preceding, discriminatory events.

Regarding the 1987 appointment, this Court has found, *supra:* 1) that Dr. Harris' explanation for the sudden need to re-establish the position is unworthy of belief (FOF 30–31); 2) that the proximity in time between Mr. Negron's receipt of a college degree and his appointment shows that Dr. Harris had predetermined who would fill the DAE vacancy (FOF 32); 3) that Dr. Harris' failure to post the vacancy was in violation of Howard

University regulations and procedure (FOF 34–36);[13] 4) that Mr. Negron did not meet the qualifications for the position even after he earned his college degree (FOF 39–40); and 5) that plaintiff was more qualified for the position than Mr. Negron (FOF 43). Based on these findings, it cannot be said that the 1987 appointment was a neutral, nondiscriminatory event. More importantly, there can be no genuine dispute that the 1987 appointment was part of a "dogged pattern" of willful discrimination. *See Shehadeh,* 595 F.2d at 725 n. 73. Indeed, it consummated a four-year plan in which Dr. Harris and Mr. Chalmers did whatever was necessary to ensure Mr. Negron's appointment to DAE at plaintiff's expense. *See Bruno v. Western Electric Co.,* 829 F.2d at 961. Therefore, the 1987 appointment was part of a continuing practice of intentional discrimination against plaintiff.[14]

Defendant places much reliance on *Valentino v. United States Postal Service,* 674 F.2d 56 (D.C.Cir.1982).[15] In *Valentino,* the District of Columbia Circuit Court of Appeals affirmed this Court's ruling that the plaintiff's class action gender discrimination claims were time-barred. *Id.* at 65. This Court had held that the plaintiff could not rely on the continuing violation theory to avoid the time bar on her pre-1976 claims, because in 1976 the defendant adopted a gender-neutral promotional system which eliminated bias against women seeking promotions. *Id.* Here, in contrast, defendant has taken no affirmative steps to ensure a fair promotional system at Howard University. To the contrary, Dr. Harris eschewed the performance appraisal system advocated by the Director of Personnel, Mr. Newman. Further, Dr. Harris disregarded Howard University's posting requirements both in 1983 and in 1987, and the university has ignored the Equal Employment Opportunity Commission's directive ordering it to remedy its illegal policies on age (*see* FOF 45). Thus, unlike *Valentino,* where the Postal Service took corrective action, here no neutral promotional system has been installed, as required by the ADEA, even though the Equal Employment Opportunity Commission has specifically directed the university to take remedial measures.

In summary, the theory of plaintiff's case has consistently been that defendant's acts of alleged discrimination—the 1983 failure to promote, the 1986 transfer, and the 1987 failure to promote—were all part of an overall, continuing plan to ensure Mr. Negron's appointment to DAE at plaintiff's expense. *See Bruno v. Western Electric Co.,* 829 F.2d at 962 (continuing violation where the plaintiff alleged that defendant schemed to force him into retirement). Because the evidence supports the inference that these three acts were both invidiously discriminatory *and* related to each other, the Court holds that plaintiff has properly alleged a continuing violation of the ADEA.[16] Therefore, his complaint has been timely filed.

### 2. Age Discrimination

The ADEA provides, in pertinent part, that it shall be unlawful for an employer

> to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age.

29 U.S.C. § 623(a)(1).

■ In this circuit, age discrimination cases are governed by the same evidentiary

---

**13.** It is well established that governing bodies are bound by the very regulations and procedures which they promulgate. *See Service v. Dulles,* 354 U.S. 363, 372, 77 S.Ct. 1152, 1157, 1 L.Ed.2d 1403 (1957) (where the Secretary of State's separation of a Foreign Service Officer was invalid because in violation of the Department of State's Regulations).

**14.** Because the evidence shows that Dr. Harris willfully engaged in a scheme to promote Mr. Negron over plaintiff, the three-year statute of limitations governs this case.

**15.** *See* Defendant's Motion for Partial Dismissal or Partial Summary Judgement at 7; Defendant's Proposed Findings of Fact and Conclusions of Law at 6; Defendant's Revised Proposed Findings of Fact and Conclusions of Law at 11.

**16.** Again, the Court's holding in Part 1 of this opinion is rendered without consideration of whether plaintiff was discriminated against because of his age, the subject of Part 2, *infra.*

scheme which has evolved in Title VII cases, first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Cuddy v. Carmen*, 762 F.2d 119, 122 (D.C.Cir.), *cert. denied*, 474 U.S. 1034, 106 S.Ct. 597, 88 L.Ed.2d 576 (1985); *Krodel v. Young*, 748 F.2d 701, 705 (D.C.Cir.1984), *cert. denied* 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985). Under this scheme, the plaintiff has the initial burden of establishing a *prima facie* case of age discrimination: he or she must demonstrate facts sufficient to create a reasonable inference that age was a factor in the employer's decision to discharge, not hire or not promote the plaintiff. Once a *prima facie* case has been established, the employer bears a minimal burden of articulating a legitimate, nondiscriminatory reason for the plaintiff's rejection. This requires the employer to produce evidence tending to show that the employee was denied employment or promotion for a legitimate, nondiscriminatory reason. If the defendant carries its minimal burden, the plaintiff must then meet his or her overall burden of persuasion in order to prevail. The plaintiff can do this by proving by a preponderance of the evidence that the reason proffered by the defendant was in fact a pretext for age discrimination, or by directly proving that the defendant was actually motivated by age discrimination. *See Cuddy v. Carmen*, 762 F.2d at 122–23; *Krodel v. Young*, 748 F.2d at 705–07.

■ In the case under consideration, plaintiff has established a *prima facie* case of age discrimination. The requirements for a *prima facie* case of age discrimination are: (1) that plaintiff was a member of the statutorily protected age group (between the ages of forty and seventy); (2) the plaintiff was qualified for the position in question; (3) the plaintiff was not hired or promoted to that position; (4) a person not of the protected age group was selected in lieu of plaintiff. *Cuddy v. Carmen*, 762 F.2d at 122; *Krodel v. Young*, 748 F.2d at 706. The parties do not dispute that plaintiff has established the first three elements of the *prima facie* case. However, since Mr. Negron was forty-three at the time of his 1983 appointment to DAE, plaintiff has not shown that the person selected was outside of the statutorily protected age group.

■ Mr. Negron's age notwithstanding, the Supreme Court has eschewed a "rigid, mechanized, or ritualistic" application of the *McDonnell Douglas* formula. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Courts are particularly reluctant to enforce the fourth requirement of the *prima facie* case in age discrimination cases involving promotion to management level positions. *See Maxfield v. Sinclair*, 766 F.2d 788, 792 (3d Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986); *McCorstin v. United States Steel Corp.*, 621 F.2d 749, 754 (5th Cir.1980). Since the principal qualification for managerial positions is often experience, employers will seldom promote or select a person under forty for these positions. *See id.; see also Maxfield v. Sinclair*, 766 F.2d at 792 (mechanistic application of the ADEA "would be of virtually no use to persons at the upper ages of the protected class whose jobs require experience since even an employer with clear anti-age animus would rarely replace them with someone under 40"). In this case, it is highly unlikely that Dr. Harris would have appointed someone younger than forty, and hence outside of the statutorily protected age group, to the position of DAE.[17] Therefore, it would be both unfair and unrealistic for the Court to limit relief in ADEA cases like the instant case to situations where the position was awarded to someone under the age of forty.

■ Plaintiff may therefore establish a *prima facie* case of age discrimination by demonstrating a substantial difference between the ages of the two candidates. *See Maxfield v. Sinclair*, 766 F.2d at 792–93 (where the plaintiff was replaced by an employee twenty years younger). In the Court's view, the seventeen-year difference between the ages of Mr. Negron and plaintiff is both substantial and sufficient to create an inference that age was a factor in defendant's decision not to promote. In short, plaintiff

---

17. The Statement of Qualifications for the DAE position specifically requires "a minimum of five years['] experience at the managerial level." *See* Joint Exhibit 3.

has established a *prima facie* case of age discrimination.

■ In response to plaintiff's initial showing, defendant has articulated legitimate, nondiscriminatory reasons for its decisions not to promote plaintiff in 1983 and 1987 and its decision to transfer plaintiff in 1986. As discussed above more fully, defendant has asserted in its pleadings and at trial that Mr. Negron was selected over plaintiff in 1983 and 1987 because he was better qualified to serve as the DAE. Defendant has also contended that plaintiff was transferred in 1986 for legitimate business reasons—as part of the reorganization of the office of the Vice–President for Business and Fiscal Affairs—and that the transfer did not constitute a demotion.[18] In support of these contentions, defendant elicited testimony from Dr. Harris, who set forth defendant's explanations for its actions in 1983, 1986 and 1987. By presenting this testimony, defendant has satisfied its burden of production. *See Loeb v. Textron*, 600 F.2d 1003, 1011 (1st Cir.1979) (the employer's burden is one of production, not persuasion). Thus, the burden shifts back to plaintiff to prove that defendant discriminated against him based on his age. *See Krodel v. Young*, 748 F.2d at 705; *Cuddy v. Carmen*, 762 F.2d at 123.

■ An ADEA plaintiff may carry his overall burden of proof in either of two ways: he may show that the reasons proffered by defendant for its employment decisions were in fact pretexts for discrimination, or he may directly prove that it was more likely than not that defendant was motivated by age discrimination. *Id.* Because of the difficulties which discrimination victims face in obtaining direct evidence of discrimination from their employers, the plaintiff is not required to both discredit defendant's explanation and provide particularized evidence of age discrimination in order to prevail. *Krodel v. Young*, 748 F.2d at 707–08; *accord Loeb v. Textron*, 600 F.2d at 1014. If the plaintiff lacks direct evidence of discriminatory intent, he may prevail by effectively cross-examining the defendant's witnesses and demonstrating that the defendant's explanation is unworthy of belief. *Krodel v. Young*, 748 F.2d at 707–08, 707 n. 4.

■ The critical question is whether defendant illegally discriminated against plaintiff because of his age. Regardless of whether plaintiff proceeds with direct evidence of discrimination or attempts to show pretext, he must ultimately prove that age was a determining factor in defendant's decision not to promote him. *Cuddy v. Carmen*, 762 F.2d at 123; *Krodel v. Young*, 748 F.2d at 706. Age need not have been the sole basis for defendant's decisions, but it must at least have been a factor that made a difference. *Id.*; *Kerwood v. Mortgage Bankers Ass'n of America, Inc.*, 494 F.Supp. 1298, 1309 (D.D.C.1980); *accord Bruno v. Western Electric Co.*, 829 F.2d at 963.

■ In the instant case, plaintiff has shown that age was a factor that made a difference in defendant's decisions to deny him promotion to DAE in 1983, to demote him in 1986, and to again fail to promote him to DAE in 1987. Plaintiff has both offered circumstantial evidence of age discrimination and has convincingly discredited defendant's explanations for its employment decisions.

As in most age discrimination cases, plaintiff's access to direct evidence of age discrimination was somewhat limited. *See Krodel v. Young*, 748 F.2d at 707 ("[employees] cannot reach into the minds of decision-makers, and therefore they usually can gather only circumstantial evidence of discriminatory motives") (quoting *Cuddy v. Carmen*, 694 F.2d 853, 859 (D.C.Cir.1982)). But plaintiff's circumstantial evidence in this case is overwhelming. This evidence, described below, established the existence of clear anti-age animus at Howard University, which dominated the employment decisions of senior officials, including the decisions not to promote plaintiff to DAE.

First, Howard University's employment opportunity policies were insensitive, if not illegal, with respect to discrimination based on age. The first edition of the Employee Handbook of 1980 proscribed discrimination in employment based on race, color, national and ethnic origin, sex, marital status, religion

**18.** *See* Defendant's Revised Proposed Findings of Fact and Conclusions of Law at 20.

or handicap, but failed to include age. It was not until 1990 that the university finally revised this language and included age discrimination as an illegal basis for employment decisions. In addition, the Handbook provides that non-faculty employees may be compelled to retire at age 70. The university's officials were advised by the Equal Employment Opportunity Commission that this provision is an erroneous statement of the law. Although they were instructed to correct this error, they have failed to do so. *See* FOF 45.

Second, the university's unlawful employment policies on age had a direct effect on the employment decisions of senior or upper management. *See* FOF 46. The senior management thought it was not bound by a prohibition on age discrimination, and they took advantage of this situation. The Court has credited the testimony of the former Director of Personnel, Mr. Arthur Newman, who testified that employees over the age of sixty or within ten years of retirement were rarely promoted to higher positions. Mr. Newman also testified that when he lost a promotion opportunity at the age of sixty-four, he was told by Dr. Harris that he was not even considered for the position because he was too close to retirement. Although the latter testimony, which the Court has found to be reliable, specifically concerns Mr. Newman's employment situation, it certainly provides background evidence with respect to plaintiff, who was also denied promotion by Dr. Harris.

Third, the retirement decisions of the employees were influenced by the university's improper age policies. *See* FOF 47. The "Benefit & Pension Handbook" provides that the "normal retirement date" is age sixty-five, and requires the employee to retire at age seventy unless he or she obtains permission from the university. Mr. Newman has credibly testified that, in practice, these policies forced mandatory retirement upon the employees at age sixty-five. The Court has inferred from this testimony that employees in their early sixties were not seriously considered for promotion to higher positions. *See* FOF 48. Obviously, this inference bears

directly on plaintiff's inability to attain promotions at ages sixty and sixty-four.

Fourth, in 1985, the President of Howard University issued a letter to the university community describing his reorganization of the office of Vice–President for Business and Fiscal Affairs. The purpose of the reorganization was to implement "effective management services for the next decade." In light of the university's compulsory retirement practices, the Court has found that the President's letter further decreased realistic chances of promotion for older employees within ten years of their "normal retirement date." *See* FOF 49. Since plaintiff was sixty-two when the President's letter was issued, there was no realistic possibility that he would be considered for promotion to a managerial position "for the next decade."

In summary, the Court has found that age bias pervaded the employment decisions of Howard University senior officials and management from 1980 through 1990. This evidence provides the backdrop against which the Court construes the pattern of events plaintiff experienced between the years 1983 and 1987. The totality of these events and circumstances and the absence of any credible evidence to the contrary lead the Court to conclude that plaintiff's age was a factor that made a difference in defendant's failures to promote him in 1983 and 1987 and its decision to demote him in 1986.

In addition, plaintiff has demonstrated that the facially neutral reasons proffered by defendant for its actions were merely pretexts for age discrimination. First, plaintiff has shown that defendant's 1983 appointment of Mr. Negron to the DAE position was inconsistent with the DAE position minimum requirements. *See* FOF 10. Second, plaintiff has disproved Dr. Harris' explanation that he cancelled the 1983 appointment of Mr. Negron due to a hiring freeze. *See* FOF 14–19. Third, plaintiff has discredited defendant's explanation that the 1986 transfer of plaintiff to Student Affairs was part of a legitimate reorganization and did not constitute a demotion. *See* FOF 25–27. Fourth, plaintiff has undermined Dr. Harris' explanation for the sudden need to reestablish the DAE position in 1987. *See* FOF 30–31. Fifth, plaintiff has

refuted Dr. Harris' testimony that the 1987 appointment had no relation to Mr. Negron's receipt of a college degree. *See* FOF 32. Sixth, plaintiff has successfully rebutted Dr. Harris' testimony that he was not required to post the 1987 DAE position vacancy. *See* FOF 35–36. Seventh, plaintiff has demonstrated that Mr. Negron was not well qualified for the DAE position in 1987. *See* FOF 39–40. Eighth, plaintiff has shown that, contrary to Dr. Harris' testimony, plaintiff was more qualified than Mr. Negron. *See* FOF 42–43. Finally, plaintiff has effectively discredited Dr. Harris' testimony that older employees at Howard University were frequently promoted and that there was no compulsory retirement age. *See* FOF 46–49. In short, plaintiff has shown that defendant's facially legitimate reasons for its actions are unworthy of belief.

The Court's conclusion that plaintiff has both demonstrated pretext and proved age discrimination with circumstantial evidence is supported by two remarkably similar ADEA cases. In *Krodel v. Young,* the Bureau of Hearings and Appeals at the Social Security Administration posted a vacancy announcement for a supervisory management analyst position. The plaintiff, who was then a sixty-year-old management analyst, applied for the position. The vacancy announcement was soon cancelled, however, on the ground that none of the applicants were qualified for the position. Shortly after the announcement was cancelled, Ms. Pronovost, who did not apply for the position initially, enrolled in a three day "crash course" in government management. Almost immediately thereafter, she was transferred to a management analyst position. Ms. Pronovost's new position was the same level of position which plaintiff had held for nearly eight years. Within a few months of Ms. Pronovost's transfer, the vacancy for the supervisory management analyst position was again posted. Both the plaintiff and Ms. Pronovost, who was twenty-one years younger, applied for the position. Needless to say, the younger candidate was promoted. *See Krodel v. Young,* 748 F.2d at 703–704.

This Circuit Court of Appeals upheld the district court's finding that the promotion of Ms. Pronovost over the plaintiff was a result of age discrimination. *Id.* at 705. In view of the fact that the original vacancy announcement was cancelled and then re-posted shortly after Ms. Pronovost had been promoted to a management position, the court found that Ms. Pronovost had been preselected. The Court also found that the defendant had overrated Ms. Pronovost's qualifications for the position and had failed to offer any concrete answers why Ms. Pronovost was more qualified than plaintiff at trial. Finally, the court found the defendant's explanation for its action unworthy of belief. *See id.* at 708–709.

The factual similarities between *Krodel v. Young* and the instant case are striking. In both instances the position vacancies were cancelled shortly after they were opened or posted. The younger candidates then enhanced their educational qualifications—with a crash course in *Krodel* and college courses in this case—and were then quickly promoted to the positions when they were reopened. This led the district court in *Krodel* and this Court to conclude that the younger person had been preselected for the position. Both courts also found that the plaintiff was more qualified than the younger candidate, and that the defendant failed to offer a credible explanation why the younger candidate had been promoted. In short, *Krodel* is on all fours with this case and supports this Court's finding of age discrimination.[19]

In *Bruno v. Western Electric Co.,* 829 F.2d at 962–64, the Tenth Circuit affirmed the district court's denial of the defendant's motion for judgment notwithstanding the jury's verdict of age discrimination. There, the plaintiff testified that when he revealed his intention to work at the defendant's company until he reached age seventy, his supervisor told him he had no plans for the plaintiff and "a lot of younger people could offer more to the job." *Id.* at 963. The supervisor then denied plaintiff's request to be transferred to another department; moreover, he told the

**19.** If anything, defendant's conduct in this case was more reprehensible than in *Krodel* because defendant twice failed to post the vacancies for the DAE position and demoted plaintiff in order to ensure the promotion of the younger candidate.

plaintiff that he was too old to be productive and offered the plaintiff early retirement. The defendant then reduced the plaintiff's autonomy and limited his dealings with upper levels of management. After the plaintiff refused a second offer of early retirement, the defendant transferred him to the accounting department, an area in which he had no prior experience, and increased his responsibilities in order to establish a poor record. The defendant testified, unpersuasively, that the transfer was part of a legitimate business reorganization. Finally, the transfer lowered plaintiff's salary and subjected him to criticism and harassment. On these facts, the Court of Appeals sustained the jury's finding of age discrimination. *See id.* at 963–64.

There are several parallels between *Bruno* and the instant case. In both cases the plaintiffs were informed, albeit more subtly in this case, that they were too old to be considered for promotional opportunities. Both plaintiffs were then transferred to new departments where they were insulated from upper levels of management. And in each case, the transfer or demotion was part of a plan to drive the plaintiff from the company or to frustrate his chances for future promotion. The cases differ in one respect: the plaintiff in *Bruno* elicited particularized, direct evidence of age discrimination, *i.e.,* his supervisor's comments that he was too old to continue working, whereas plaintiff in the instant case offered an abundance of circumstantial evidence of age discrimination (which is sufficient to prove intentional age discrimination, *see Krodel v. Young,* 748 F.2d at 707). In both cases, however, the evidence of intentional age discrimination was substantial, and the plaintiffs effectively disproved the defendants' explanations for their employment decisions. Thus, the *Bruno* case lends additional support to this Court's holding that age made a difference in defendant's employment decisions in violation of defendant's obligations under the ADEA.

## CONCLUSION

In summary, plaintiff has properly alleged a continuing violation of the ADEA and his complaint has been timely filed. In addition, plaintiff has proved a *prima facie* case of age discrimination, he has convincingly disproved defendant's explanations for its employment decisions, and he has submitted substantial evidence in support of his claims of intentional age discrimination. Based on this evidence, the Court concludes that defendant violated the ADEA when it failed to promote plaintiff in 1983 and 1987 and when it demoted him in 1986. An appropriate Order implementing the Court's conclusions has been issued.

## ORDER

For the reasons set forth in the attached Memorandum Opinion, it is by the Court this 17th day of March, 1993,

ORDERED that plaintiff has properly alleged and established a continuing violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.;* and it is further

ORDERED that plaintiff's complaint, including his pre–1987 claims of age discrimination, has been timely filed; and it is further

ORDERED that defendant violated the Age Discrimination in Employment Act when it failed to promote plaintiff in June 1983, transferred him involuntarily in December 1986, and failed to promote him in July 1987; and it is further

ORDERED that plaintiff shall have until thirty days from the date of entry of this Order to file a motion alleging specific damages which may have been caused by defendant's adverse employment decisions; and it is further

ORDERED that defendant shall have until thirty days after its receipt of plaintiff's damages motion to file an opposition.